**AMOCO OIL COMPANY, Plaintiff,**

**and**

**Tartan Oil Corp., Plaintiff-Intervenor,**

**v.**

**D.Z. ENTERPRISES INC. and Dinc H. Karabag, Defendants.**

**No. CV 84–3202.**

United States District Court, E.D. New York.

April 24, 1985.

596

Townley & Updike, New York City, for plaintiff.

Carl S. Levine, Garden City, N.Y., for plaintiff-intervenor Tartan Oil Corp.

Burns & Berger by Lawrence Berger, Garden City, N.Y., for defendants.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

Amoco Oil Company (Amoco) brings this action for trademark infringement under the Lanham Act, 15 U.S.C. §§ 1114, 1125, and New York General Business Law § 368 (McKinney 1984), and termination of its franchise dealership agreement with defendant D.Z. Enterprises, Inc. and its president Dinc H. Karabag (collectively Karabag) under the Petroleum Marketing Practices Act (PMPA or Act). 15 U.S.C. §§ 2801–2806. Tartan Oil Corporation (Tartan Oil), which has broker agreements with Amoco and Karabag and leases a service station to Karabag, was granted leave to intervene as plaintiff-intervenor. Tartan Oil seeks to end Karabag's leasehold.

When Amoco filed this action it also sought a preliminary injunction, which was withdrawn when plaintiff and defendant entered into a debranding agreement. Discovery has proceeded, and based on information from interrogatories and depositions Amoco now moves for partial summary judgment against Karabag, Rule 56(b), Fed.R.Civ.P. Plaintiff asks this Court to hold as a matter of law that Karabag has violated the Amoco trademark and that Amoco's termination of the franchise agreement is valid under the terms of the PMPA and the agreement itself. Tartan Oil also moves for partial summary judgment in its favor and asks this Court to hold Karabag in breach of the broker agreement and the service station lease agreement and order defendant to vacate the premises, and dismiss defendant's counterclaims. Karabag opposes both motions, maintaining that defendant has not violated the Amoco trademark, and that oral modifications of the agreements with Tartan Oil preclude any action for breach. Karabag has raised a number of affirmative defenses and counterclaims against both plaintiff and intervenor.

### I.

Karabag operates an Amoco station at Route 112 and Sunrise Highway in Patchogue, New York. Defendant took over the lease to those premises by assignment in June of 1982 from Ilter Karakurt. Tartan Oil is the landlord of the service station but Amoco owns certain of the fixtures and equipment and its distinctive trademark designations displayed about the station. In addition to owning and leasing the gas station, Tartan Oil is a motor fuel broker. As such Tartan Oil does not distribute or take title to any of the motor fuels it brokers. There are four agreements linking the three parties together: a broker agreement between Amoco and Tartan Oil, a broker agreement between Tartan Oil and Karabag, a lease on the Sunrise Highway

station between Tartan Oil and Karabag, and a supply contract between Amoco and Karabag. Breach of the last three agreements is at issue here.

## II.

The Court first addresses Amoco's motion for summary judgment against Karabag for violation of §§ 32(1)(a) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1)(a) and 1125(a), and for termination under the PMPA, 15 U.S.C. §§ 2801–2806.

Amoco is a refiner and distributor of petroleum products. The Amoco mark is registered as a trademark with the United States Patent and Trademark Office and so comes under the protection of the Lanham Act. It is undisputed that Karabag is dispensing through Amoco-branded pumps gasoline that was not sold to defendant by Amoco or designated by Amoco as Amoco-brand gasoline. In his deposition, answers to interrogatories, and affidavit Dinc Karabag declares that he bought gasoline from Petroleum Haulers, Inc., paying cash and retaining no receipts, and sold it to the public from Amoco pumps. Defendant contends that this is not a violation of Amoco's trademark because defendant is selling exactly the same gas that Amoco supplies. As an affirmative defense to the trademark violation Karabag argues that the practice of commingled storage, which is common in this area, vitiates Amoco's trademark. Defendant also claims that failure to add patented additives voids the trademark.

Commingling is a practice whereby several refiners deposit and draw their product from a common storage facility. The commingled storage tanks in this case are in Setauket, and the gasoline drawn from these tanks by Amoco, therefore, is not necessarily refined by Amoco. Nevertheless, gasoline from commingled storage can be made unique by mixing in special additives when the tank truck draws the gas. Amoco has patented Amotone, an additive that cleans an automobile's carburetor, and claims that it is added to all the gasoline that Amoco distributes for sale through Amoco-branded stations. Karabag claims not only that Petroleum Haulers' gas is from the same storage tanks at Setauket as Amoco's, but that drivers delivering Amoco-branded product told him that Amotone was frequently not added to their tanker loads. This, Karabag argues, vitiates any basis for Amoco's claim that Karabag has violated its trademark.

Not surprisingly, defendant cites no law in support of his position. There is none. Nor need the Court labor long over the trademark issue. The law is clear and unequivocal. It is of no importance whether Amoco sells commingled gas, whether Petroleum Haulers draws from the same storage facility as Amoco, or whether Amotone is added. What is important is the undisputed fact that Karabag sells from Amoco pumps gasoline that Amoco had not designated as Amoco-brand gasoline.

It is settled that the trademark holder need not actually manufacture the branded product in order to receive trademark protection, but can merely select and designate the product bearing its mark. *Menedez v. Holt*, 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526 (1888). This principle has been applied explicitly to cases of gasoline branding like the one at hand. In *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 478 F.Supp. 243 (E.D.Pa.1979), *aff'd*, 637 F.2d 105 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981), the plaintiff contended that since Texaco purchased gasoline from other refiners and sold it to plaintiff as Texaco gasoline, Texaco could not claim plaintiff violated its trademark by doing the same thing. This is exactly Karabag's argument. The law, however, holds the contrary to be true. As the *Sweeney* Court held, what constitutes a particular brand of gasoline is for the trademark holder in its discretion to determine. *Id.* at 279. Moreover, commingling, the refinery of the gasoline, and the presence or absence of patented additives are not determinative of the trademark. *Id.* As the Sweeney Court held,

> Clearly, Texaco had the right to put its trademark on whatever gasoline it

deemed suitable. The crucial point ... is that just because Texaco, the owner of the trademark, could decide what gasoline to market under that trademark does not mean that Sweeney, who had only the right to sell gasoline so marked, had a like right to decide which gasoline to call Texaco.

*Id.* at 279–80. In short, the trademark need not designate a source to be valid, but can be a quality mark. Nor is the mark dependent on the presence of an additive. *See, Power Test Petroleum Distributors, Inc. v. Calcu Gas, Inc.,* 754 F.2d 91 (2d Cir.1985).

Again, the underlying principle is that the owner of the trademark alone has the right to decide what gasoline meets its standards and qualifies to bear its trademark. Karabag would have the Court uphold the trademark only if it designates gasoline refined by Amoco or mixed with the patented Amotone additive. Clearly this runs contrary to the law. Moreover, it flies in the face of logic and reality. The Amoco brand attaches a distinctive label to a product, with it comes customer recognition and goodwill. Even more importantly, with the Amoco brand comes national advertising and the Amoco credit card system, already in place and yielding great benefit to the gas station operator yet well beyond his ability to afford on his own. Karabag appears to argue that the dealer can do what he likes with the Amoco trademark, benefit from the recognition and goodwill Amoco has built up, and pay Amoco nothing. Amoco receives no rent for the Karabag station, or its equipment, or the use of its logo, but takes payment for the use of its trademark from the sale of gasoline to the franchisee. For Karabag to use the Amoco trademark as defendant pleases while depriving Amoco of any revenue from its trademark is to attack the core purpose of trademark and franchise as it exists in this country.

Furthermore, there is evidence that Karabag is playing fast and loose with the Amoco trademark in a manner that substantially impairs its value and identity. While the Court does not take it as a proven fact, plaintiff has alleged and submitted an affidavit and documents in support showing that the gasoline Karabag has sold through Amoco pumps fails to meet its standards on lead content. Tests performed on June 14, 1984 showed that gasoline taken from the Karabag station's unleaded regular gasoline pump exceeded Amoco's lead limit of .05 by .011 grams per gallon, and gasoline from the unleaded premium pump exceeded the lead limit of .05 by .016 grams per gallon (Affidavit of John Roberts, ¶ 5).[1] If these allegations are true, this case presents more than a legal violation of the Amoco trademark and impairment of its value and identity, it presents a palming-off on the public of an inferior product under another's trademark with concomitant loss of reputation and customer goodwill for the real product. *See, Spring Mills, Inc. v. Ultracashmere House, Ltd.,* 689 F.2d 1127 (2d Cir.1982).

Finally, Karabag's argument that the agreement with Amoco allowed the purchase and sale of non-Amoco gasoline from defendant's station is irrelevant. The agreement did not allow the use of Amoco-branded or owned equipment for the storage or sale of non-Amoco products. Any contention that Amoco knowingly would allow gasoline over which it had no quality control and derived no revenue to be sold from Amoco pumps is incredible to the point of absurdity or patent falsehood. While the agreement may entitle Karabag to sell unbranded gas from unbranded pumps on the premises, the point is immaterial to the Lanham Act violation.

■ The law and the facts are unambiguous. Accordingly, the Court holds that by selling through Amoco-branded pumps gasoline that Amoco had not sold to Karabag or particularly and specifically designated as Amoco gasoline, Karabag, as a matter of law, violated the Lanham Act and state law. 15 U.S.C. § 1114 and N.Y. General

---

**1.** It is alleged in Mr. Roberts affidavit that Mr. Karabag grabbed the samples taken for laboratory octane testing from Mr. Roberts' possession.

Business Law § 368–b. Summary judgment on this point is granted for Amoco.

### III.

The Court next addresses Amoco's motion for summary judgment under the PMPA, 15 U.S.C. §§ 2801–2806. Specifically, Amoco asks the Court to hold that Karabag's trademark violation violated the terms of the franchise agreement, and to allow immediate termination of the franchise under the PMPA.

The PMPA was enacted to protect the interests of the retail dealer in the face of the overwhelming power of the franchising refiner and distributor. Specifically, it seeks to limit the termination of a franchise agreement to material violations of the agreement, set out notice requirements and time limits in order to restrain arbitrary action by the franchisors, and allow the franchisee to cure any violations and preserve the franchise.

Under the PMPA a franchise includes a contract between a refiner and a retailer that provides for the use of a trademark in connection with the sale of motor fuel. 15 U.S.C. § 2801(1)(A)(ii). A refiner is defined as one who refines crude oil into motor fuel, a term that clearly includes Amoco, and a retailer is one who purchases motor fuel for resale to the general public, a term clearly applicable to Karabag. 15 U.S.C. § 2801(5) and (7). The PMPA, then, applies to the franchise relationship between Amoco and Karabag.

In relevant part § 2802 provides:

(b)(1) Any franchisor may terminate any franchise ..., if—

(A) the notification requirements of section 2804 of this title are met; and

(B) such termination is based upon a ground described in paragraph (2) ....

15 U.S.C. § 2802. Paragraph (b)(2) of the section then provides in pertinent part:

(2) for purposes of this subsection, the following are grounds for termination of a franchise ...:

\* \* \* \* \* \*

(C) The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of

the franchise or nonrenewal of the franchise relationship is reasonable, if such event occurs during the period the franchise is in effect and the franchise first acquired actual or constructive knowledge of such occurrence—

(i) not more than 120 days prior to the date of which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a) of this title; or

(ii) not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 2804(b)(1) of this title.

Further on § 2802 declares:

(c) As used in subsection (b)(2)(C) of this section, the term "an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable" includes events such as

\* \* \* \* \* \*

(10) willful adulteration, mislabeling or misbranding of motor fuels or other trademark violations by the franchisee;

. . . .

Without question, Karabag's admitted misbranding and violation of the Amoco trademark is an event relevant to the franchise relationship that justifies termination of the franchise. In *Wisser Company v. Mobil Oil Corp.*, a case directly on point with the instant one, the Court of Appeals for the Second Circuit held that misbranding by the franchisee retailer not only was a ground for termination, but under the PMPA was a ground for termination forthwith. 730 F.2d 54 (2d Cir.1984). In holding that Mobil could give less than the usual ninety day notice of termination, the *Wisser* Court declared, "It is clear from the structure of the statute that Congress meant to give franchisees the right to cure for some kinds of conduct that if continued would warrant termination or nonrenewal, but did not intend to require a second chance for other kinds of conduct or conditions." *Id.* at 59 (citations omitted). The *Wisser* Court explicitly held that the mis-

branding is conduct that does not warrant a chance to cure under the PMPA. Thus, Amoco would not be required to give the at least ninety days notice provided in § 2804(a)(1), but could give less than ninety days notice as provided in § 2804(b)(1). Further, the *Wisser* Court held that in the case of misbranding, forthwith notice was reasonable under § 2804(b)(1).

In addition, the Court of Appeals held that failure of the franchisor to act on the first instance of knowledge of misbranding within the sixty days required by § 2802(b)(2)(C)(ii) does not permanently waive the franchisor's right to terminate. Rather, a repeat occurrence of the misbranding renews the franchisor's right to terminate on that ground. *Wisser Company v. Mobil Oil Corp.*, 730 F.2d at 60.

On August 1, 1984 plaintiff commenced this action by filing a complaint alleging violation of the Lanham Act, 15 U.S.C. §§ 1114, 1125, and New York General Business Law §§ 360–368 (McKinney 1984). On September 7, 1984 plaintiff filed its First Amended Complaint, which as its Ninth Cause of Action added the allegation of violation of the franchise agreement and the propriety of termination of the supply agreement under the PMPA, in fact asking the Court to enter an order terminating the agreement. The plaintiff specifically alleged misbranding and product adulteration as the reason for termination of the franchise, pursuant to 15 U.S.C. § 2802(c)(10). On September 7, 1984 plaintiff sent by certified mail a cover letter captioned "Termination Notice" enclosing the First Amended Complaint and the summary of the PMPA required under § 2804(c)(3)(C).[2] The plaintiff asks the Court to consider this the notice of termination in conformance with 15 U.S.C. § 2804.

Section 2804 lays out the requirements for notice of termination thusly:

(c) Notification under this section—
(1) shall be in writing;
(2) shall be posted by certified mail or personally delivered to the franchisee; and

(3) shall contain—
(A) a statement of intention to terminate the franchise or not to renew the franchise relationship together with the reasons therefor;
(B) the date on which such termination or nonrenewal takes effect;
(C) the summary statement [of PMPA rights and remedies published by the Secretary of Energy.]

Notably, Amoco did not name the date on which it intended to terminate the agreement. Amoco has explained in proceedings before the Court that because of an earlier restraining order issued by the state court and the already pending suit and motion for a preliminary injunction in this Court, it chose to defer to the Court on the date of termination. The plaintiff's notice form is certainly unusual and perhaps unprecedented in the short history of the PMPA. While it clearly conforms to PMPA requirements by giving notice of intent to terminate, the reason for termination, and notice of the franchisee's rights under the PMPA, strictly speaking, plaintiff has not given the required notice of the effective date. 15 U.S.C. § 2804(c)(3)(B). This leaves the Court with several alternatives: the Court can hold the notice of termination invalid for failure to meet the notice requirements of the PMPA, it can read in either the ninety day or 120 day notice period provided by the Act, or it can deem it a forthwith notice of termination.

In considering the termination notice and the PMPA requirements the Court takes note of certain events. Under the auspices of the Court plaintiff and defendant came to a negotiated agreement on September 10, 1984 in place of pursuing the application for a preliminary injunction. The gist of the agreement was that defendant would debrand the station by removing the Amoco mark from pumps dispensing unbranded gas and allowing Amoco to remove the large, oval, pole-mounted Amoco sign. The stipulation also allowed Amoco to re-

---

**2.** The four line text of the letter referred Mr. Karabag to the enclosures for the substance of the notice.

move its equipment after sixty days. Obviously, the agreement allowed Karabag to cure its trademark violations by either debranding the station or returning to the terms of the franchise agreement. By letter dated November 14, 1984 plaintiff's attorney protested Karabag's failure to comply. Specifically, counsel charged defendant with violating every element of the stipulation, including barring Amoco's contractor from entry on the premises to remove Amoco's equipment. Clearly, Karabag has no interest in taking advantage of any opportunity to cure, whether it is given by the notice requirements of the PMPA, or by the grace of the plaintiff or the Court.

■ Considering that the purpose of the Act is to protect the franchisee, the Court is inclined to give it a strict construction that would not tend to allow the franchisor latitude in conforming to the requirements. Nevertheless, an overly technical interpretation is not desirable. While the PMPA is meant to protect the franchisee, this Court refuses to interpret it or apply it so as to shield a franchisee from the reasonable consequences of its bad act. Looking to the particular configuration of facts in this case—specifically, the tangle of legal proceedings and maneuvers among three parties trying to preserve disparate rights, the pendency of the case before the Court when the notice to termination was made, the events that *de facto* gave Karabag time to cure any violations, and Karabag's manifest unwillingness to cure violations or live up to the negotiated agreement that substituted for action on the preliminary injunction application, and the egregious nature of the violation of the franchise agreement—the Court will not hold Amoco's termination notice void under the PMPA. Rather, the Court holds that the September 7, 1984 notice is a notice to terminate forthwith.

■ The Court next considers whether the termination notice was timely. That is, whether under § 2802(b)(2)(C) Amoco acted within the required time after acquiring knowledge of Karabag's violation of the

agreement. On June 14, 1984 testing by an Amoco representative of Karabag's gasoline showed that the gasoline did not meet Amoco's lead standards. (Affidavit of John Roberts, ¶ 5). In his deposition of July 6, 1984, Dinc Karabag declared that he was buying his gas from Petroleum Haulers, Inc. Furthermore, it is clear from Karabag's submissions that the trademark violations are ongoing and continuing, and not one or two isolated incidents. Section 2802(b)(2)(C) requires that notice of termination in less than ninety days must be based on a violation of which the franchisor acquired knowledge no more than sixty days before. Amoco initiated its suit for misbranding on August 1, 1984 and amended the complaint on September 7, 1984, using the amendment as part of its termination notice. Again, where there are repeat occurrences of the violative conduct, each new event is a ground for termination. *Wisser Co., Inc. v. Mobil Oil Corp.*, 730 F.2d at 59–60. In this instance it is undisputed that continued purchases and sales of non-Amoco gasoline in violation of the trademark and the franchise agreement extended through August and September of 1984. The Court, therefore, finds the September 7th notice of termination timely under the PMPA.

Accordingly, the Court concludes that Amoco's termination notice of September 7, 1984 meets the requirements of the PMPA as notice to terminate forthwith the franchise agreement. Plaintiff's motion for summary judgment on this point is granted.

## IV.

The Court next addresses intervenor Tartan Oil's motion for summary judgment. Tartan asks that the Court uphold termination of the lease and broker agreement, that the Court hold Karabag liable for damages for breach of the agreements, that Tartan be awarded possession of the gas station leased to Karabag, and that Karabag's counterclaims be dismissed.

By registered letter of July 2, 1984 (Intervenor's Exhibit 10) Tartan Oil notified

Karabag that it was terminating the lease for Karabag's failure to purchase gasoline as required by the lease. As provided in the lease, termination was effective in five days. Karabag sought an injunction in state court to prevent termination and eviction. Amoco filed this suit on August 1, 1984, and thereafter the state suit was discontinued (Intervenor's Exhibit 13) and Tartan Oil intervened in this action.

■ As a threshold issue the Court notes that the Tartan Oil-Karabag agreements are not governed by the PMPA. Tartan Oil is not a franchisor-distributor under the Act as it does not take possession, title, or control of motor fuels. 15 U.S.C. § 2801(6). Thus the Tartan Oil-Karabag relationship is not a franchise under the PMPA. 15 U.S.C. § 2801(1)(A) and (B). Rather, the relationship is defined by a lease for the Sunrise Highway gas station (Intervenor's Exhibit 8) and a broker agreement (Intervenor's Exhibit 9). In addition, Tartan Oil has a broker agreement with Amoco (Intervenor's Exhibit 1) and Karabag has a supply contract with Amoco (Intervenor's Exhibit 6). Karabag originally assumed the lease of Ilter Karakurt in June 1982. The current lease was entered into in February 1984 and runs through June 1985, as does the broker agreement.

Nevertheless, Karabag contends that under the state version of the federal PMPA, the New York motor fuels franchise act, New York General Business Law § 199 (McKinney Supp.1984–1985), Tartan Oil is a "distributor" and must conform to the statutory termination requirements. A distributor is defined by § 199–a, subd. 1. as "any person engaged in the sale, consignment, or distribution of motor fuels to dealers." There is no further elucidation or case law interpretation. Tartan Oil contends that it is a broker, not a distributor within the meaning of the New York motor fuels franchise act, hence its relationship with Karabag is not governed by the act.

■ In this instance Karabag has a direct contract with the gasoline supplier, Amoco. Under that agreement defendant called an Amoco office or agent, left an order message on a tape, took delivery of gasoline from a tanker truck driven by an employee or hireling of Amoco, and paid Amoco for the gasoline. Tartan Oil then received a commission for each gallon of gas purchased by Karabag. Tartan Oil does not take title, possession, or a bailment of any motor fuel under this arrangement.

A distributor is generally defined as a person or legal entity that "stands between the manufacturer and the retail seller in purchases, consignments, or contracts for sale." Black's Law Dictionary at 427 (West Pub. Co., 5th ed. 1979). The term is synonymous with "wholesaler", or one who buys in large quantity for sale to retailers, not consumers. *Id.* at 1432. Consignment means to take possession or bailment of goods for transport or sale, without necessarily taking title. *Id.* at 278. Under the common meaning of the terms used by the statute, taking title or possession is a necessary part of being a distributor. In contrast, a broker brings seller and buyer together, negotiates contracts between them, and receives a commission. *Id.* at 174–75. The Court concludes that Tartan Oil, because it does not take title or possession of motor fuels, or even act as an intermediary in the process of ordering and supplying gasoline, is not a distributor within the meaning of § 199–a, subd. 1. Accordingly, neither the PMPA or the New York motor fuels franchise statute control the Tartan Oil-Karabag relationship.

Pursuant to the Tartan Oil-Amoco broker agreement, Tartan Oil receives a commission of 2.5¢ for each gallon of gas sold by Amoco to Karabag (Intervenor's Exhibit 1, ¶ 6 and Sched. A). Under the gas station lease Karabag pays Tartan Oil $3400.00 a month in rent and pursuant to § 4.07(d) of the lease, covenants to purchase a minimum of 100,000 gallons of gasoline a month from a supplier designed by Tartan Oil (Intervenor's Exhibit 8). Failure to purchase the minimum gives Tartan Oil the option of cancelling the lease or charging 3¢ per gallon of the shortfall from 100,000 gallons. The broker commission on Kara-

bag's purchase of gasoline supplies from the designated supplier (Amoco) then is a material term of the interlocking lease and Tartan Oil-Karabag agreement, both by virtue of the substantial revenues it yields to Tartan Oil and the explicit terms of the lease and broker agreement.

Under ¶ 13 of the Tartan Oil-Karabag broker agreement (Intervenor's Exhibit 9), Amoco is designated as Karabag's supplier. This broker agreement also provides for the 100,000 gallon minimum purchase, purchased exclusively from the designated supplier, and trademark authorization. The agreement is almost completely pre-printed with blanks filled in by typewriting for dates, the station address, quantities and the designated supplier. All the fill-ins are initialed, except for the ¶ 13 designation of Amoco as the authorized trademark and gasoline supplier for the Sunrise Highway station. Defendant makes much of the fact that this paragraph is not initialed. This might be important if the designation of Amoco were a surprise to Karabag. But it is not. Karabag's station carries the trademarked Amoco logo and color configuration. There is a supply and trademark contract between Karabag and Amoco (Exhibit 6) and Karabag ordered and paid for gasoline from Amoco.

Obviously Karabag was not hornswoggled into an agreement, the terms of which he could not and did not know. Karabag is not now being held to contract provisions sprung on him out of the blue. Dinc Karabag signed a lease and a broker agreement with Tartan Oil, both of which refer to the other and repeatedly provide that Karabag shall obtain motor fuels only from a supplier designated by Tartan Oil. That Karabag chose to operate in an Amoco-branded station, and bought Amoco-supplied gasoline for many months without apparent objection to either the designation clause or Amoco, manifests a knowledge and acceptance of the supplier arrangement. Defendant cannot now gainsay these terms of the contract after such long use.

■ Karabag further contends as an affirmative defense that Tartan Oil knew and acquiesced in defendant's abandonment of Amoco as a supplier and thus waived its claim for breach of contract. Karabag asserts that Tartan Oil had constructive knowledge that Karabag was purchasing unbranded gasoline instead of Amoco gasoline because of the decline in reported purchases from Amoco over a period of months. The argument of constructive knowledge and waiver is insubstantial. Defendant would be the first party to protest as unreasonable termination by Tartan Oil based on several months of declining purchases from Amoco. That Tartan Oil did not act until there was an unambiguous trend that could only be explained by purchases of unbranded gasoline was fair and reasonable under the circumstances. Arguments as to constructive knowledge are untenable and baseless in this case. Equally so, there is no basis for claiming waiver. Tartan Oil gave Karabag what amounted to a cure notice in July 1983 and by May 1984 had moved to terminate.

■ It is clear that defendant has defaulted on a material provision of its lease and broker agreement with Tartan Oil. Second only to the rental provision, the interdependent terms of a designated supplier, minimum purchases and commissions thereon, with provisions for payments in cases of purchase deficiencies and supply shortages, are integral to the purpose of the lease and the primary purpose of the broker agreement. Karabag insists that the lease and broker agreement were orally modified to allow defendant largely to abandon Amoco as a supplier. Were this true it would provide no escape from adherence to the written terms of the lease and contract. By the law of the two agreements and of the state, oral modification is not valid. Nor has the defendant shown any reason for this Court to look outside the four corners of the written agreements and allow parol evidence as to the lease, the broker agreement, or any purported modification of them. The language is clear and unambiguous in both agreements.

■ Moreover, Amoco's termination of the supply contract with Karabag, upheld earlier, in effect cancels the Tartan Oil-Karabag broker agreement. Karabag has breached the lease and broker agreement and rendered lifeless any claim of permission to sell unbranded gas on the station premises by violating Amoco's trademark. By destroying the Karabag-Amoco relationship, defendant has vitiated the broker agreement and material provisions of the lease. Karabag has unilaterally deprived Tartan Oil of the fruits of its bargain with Amoco and an important source of revenue under the lease.

Accordingly, the Court concludes that Karabag defaulted on the lease and broker agreement. Tartan Oil is entitled to termination of the lease and broker agreement and damages under both.

### V.

Karabag has asserted several counterclaims against Amoco. The issues raised largely have been dealt with above. Briefly, Karabag first alleges that Amoco breached the supply contract by commingling and failing to add Amotone to the gasoline it supplied to Karabag, and second, by the same omission, violated New York Business Law § 349, entitled Deceptive Acts and Practices Unlawful. As a third counterclaim against Amoco, Karabag alleges that Amoco violated New York General Business Law, art. 22-A (False Advertising; Civil Penalty). Karabag claims there is no remedy at law for these violations and seeks the equitable relief of injunction.

It is axiomatic that he who seeks equity must have clean hands. Should the Court hold Karabag to this principle defendant is in dire straits, indeed. Karabag complains that Amotone was not added to the Amoco brand gasoline sold to him, but fails to allege with any specificity the dates, places, and persons involved, the factual basis for his assertion, or the damage done him. As discussed earlier, failure to add Amotone does not impair the trademark, nor does commingling. More to the point,

Karabag apparently attaches little real importance to the quality of Amoco or any other gasoline he sells. Defendant did not protest the absence of Amotone when he allegedly learned of it. In fact, defendant chose to sell unbranded gas instead. Evidence was presented that this gas exceeded lead limits, which worse than lacking Amotone, can harm the workings of a large number of cars. Karabag's allegations are perhaps based on misplaced indignation rather than provable fact and concern for product quality. Defendant's counterclaims lack sufficient factual allegations and specificity. The prayer for injunctive relief is without principle or support, and no factual grounds for money damages have been set forth. Accordingly, defendant's counterclaims against Amoco are dismissed.

### VI.

■ Karabag also interposes counterclaims against Tartan Oil. Again, most of the issues raised as counterclaims have been discussed and resolved earlier. First Karabag claims that Tartan Oil by its lease and broker agreements and its practices has violated the anti-trust laws. On the facts stated, as a matter of law the anti-trust claim fails. *See, Power Test Petroleum Distributors, Inc. v. Calcu Gas, Inc.,* 754 F.2d 91, (2d Cir.1985). Second, defendant claims that Tartan Oil committed fraud and misrepresentation by supplying gas to Karabag from commingled sources. The undisputed facts are that Tartan Oil exercised no control over the Amoco products delivered to Karabag and cannot be liable for the commingling, if commingling is indeed a ground for fraud and misrepresentation. Accordingly, this counterclaim must be dismissed. The third counterclaim alleging the same sort of product adulteration fails for the same reason.

The fourth and fifth counterclaims are based on Tartan Oil's violation of the PMPA and New York General Business Law § 199. As discussed fully above, neither of these laws or their requirements apply to Tartan Oil.

Finally, Karabag alleges that Tartan Oil unilaterally foisted Amoco on defendant as the designated exclusive supplier. Karabag claims that Tartan Oil made representations that Karabag could get fuel supplies from any source and did not fill in the blanks in ¶ 13 of the broker agreement with Amoco's name until after the agreement was signed. As noted earlier, defendant has not presented any ground for going outside the plain language of the agreements with Tartan Oil and allowing parol evidence. Both the lease and the broker agreement provided repeatedly for a designated exclusive supplier. In fact, without the designation of an exclusive supplier the broker agreement is almost meaningless. It is absurd for Karabag to think that he could operate an Amoco-branded station without selling Amoco gasoline. The lease and the broker agreement both stipulate that they can be modified only in writing. If the understanding between Karabag and Tartan Oil was that defendant had a free choice of suppliers, then the blanks in ¶ 13 should have been lined out and the lease and broker agreement modified, as it has been in other terms, to reflect this alleged oral understanding. Otherwise, Karabag is held to the plain meaning of the written agreements. The lack of initials alongside ¶ 13 does not by itself support the introduction of parol evidence in the case. Defendant's counterclaim for breach of contract based on an alleged unilateral and arbitrary imposition of an exclusive supplier must fail. Dinc Karabag is an educated businessman who will be held to the terms of the contracts he signs.

### VII.

It is undisputed that Karabag is selling unbranded gasoline through Amoco-brand pumps and is not purchasing motor fuels from Amoco. As a matter of law, therefore, defendant has violated plaintiff's trademark and a material term of the supply agreement. Accordingly, Amoco is entitled to summary judgment on the issues of trademark violation and termination of the supply agreement. Defendant's three counterclaims against Amoco must be dismissed as baseless and the application for injunctive relief denied.

As a matter of law defendant has also breached the terms of the lease and broker agreement with Tartan Oil, and the intervenor is therefore entitled to summary judgment on those issues. Defendant's six counterclaims against Tartan Oil are without factual or legal support and must be dismissed.

Accordingly, plaintiff's and intervenor's motions for partial summary judgment are granted. Amoco is entitled to terminate its supply agreement with defendant and remove its trademark logo and equipment from the Sunrise Highway station. Defendant is permanently enjoined from using the Amoco trademark and is liable for trademark violation. Tartan Oil is entitled to terminate its lease and broker agreement with defendant and to take possession of the premises at Route 112 and Sunrise Highway, Patchogue, New York. Defendant is also liable for damages stemming from breach of these agreements. The issues of the amount of damages for trademark violation and the breach of the lease and Tartan Oil-Karabag broker agreement remain unresolved. Further proceedings to determine the amount of damages will be scheduled by the Court.

SO ORDERED.