**DANDY OIL, INC., a Michigan corporation, Plaintiff,**

v.

**KNIGHT ENTERPRISES, INC., a Michigan corporation, Defendant.**

**No. 86–CV–3984–DT.**

United States District Court, E.D. Michigan, S.D.

March 6, 1987.

J. Donald McLeod, Dahlberg, Mallender & Gawne, Birmingham, Mich., for plaintiff.

Robert E. Forrest, Raymond & Dillon, Detroit, Mich., Charles A. Roehl, Warren, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

WOODS, District Judge.

Plaintiff Dandy Oil, Inc. ("Dandy") seeks to enjoin defendant Knight Enterprises, Inc. ("Knight") from terminating their franchise agreement. The Court, having conducted a hearing and having heard arguments by counsel, submits the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. Dandy is a Michigan corporation with its principal place of business at Troy, Michigan.

2. Knight is a Michigan corporation with its principal place of business at Farmington, Michigan.

3. Dandy operates five Union Oil Company of California (Unocal) branded retail service stations and four unbranded service stations under the Dandy name. Dandy also wholesales gasoline to two Unocal branded stations.

4. Gasoline pumps and tanks at all Dandy stations are owned by Dandy, not Knight or Unocal.

5. Gasoline pumps at Dandy's Unocal branded stations do not bear Unocal's Union 76 trade name or logo.

6. Nevertheless, the signs on the poles and buildings at Dandy's Unocal branded stations display the Union 76 trade name.

7. Dandy sells non-Union 76 gasoline at all its stations, including its Unocal branded stations.

8. On October 5, 1982, Dandy entered into a "Jobber Sales Agreement" with Unocal.

9. From that date until approximately March of 1985, Dandy was a marketer or wholesaler of Union 76 gasoline produced by Unocal.

10. Paragraph 14 of the "jobbership" agreement gave Dandy the right to use Unocal's trademarks, trade names, and brand names in its operation. That right was subject to Dandy's obligation not to sell or permit the sale of motor fuel or products purchased by Dandy under the brand names, trade names, or trademarks of Unocal unless such gasoline or products were purchased from Unocal or were certified by the supplier to be Unocal products.

11. Paragraph 14 prevented Dandy from comingling products purchased from others with Unocal products or selling or permitting the sale of such comingled products under the brand names, trade names, or trademarks of Unocal.

12. Dandy was also required to purchase sixty percent of the quarterly gasoline, diesel fuel, and heating oil maximum gallons stated in the agreement. Dandy's gasoline purchases for the second, third, and fourth quarters of 1984 never approached the sixty percent requirement.

13. The inference from Dandy's failure to purchase the required minimum volume of gasoline is that Dandy made substantial purchases of gasoline from other major refiners or independent suppliers.

14. Unocal was aware of Dandy's failure to purchase required volumes of gasoline. In the fall of 1984, Unocal began termination proceedings under the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. § 2801, *et seq.*, to end the jobbership agreement with Dandy.

15. Unocal also knew that Dandy was purchasing non-Union 76 gasoline and marketing it at Dandy's Unocal branded stations.[1]

16. Dandy, apparently aware of the imminent termination of the jobbership agreement, agreed with Knight for the sale and assignment of the jobbership to Knight.

17. Paragraph II of the agreement for the sale and assignment of the jobbership required Knight to supply Dandy's needs for gasoline and other petroleum products.[2]

---

1. Unocal, however, has never accused Dandy of misbranding or mislabeling, even though Dandy's failure to make minimum purchases of gasoline indicated such a practice.

Unocal frequently purchases gasoline from other refiners and delivers it to its distributors. Dandy emphasizes this fact in arguing that gasoline is fungible. According to Dandy, it cannot be found to have violated Unocal's trademark because the gasoline it sells equals or exceeds the quality of Unocal gasoline. That argument is without merit. Unocal is not required to manufacture gasoline before obtaining trademark protection. Instead, Unocal need only select the gasoline to bear its trademark. *See, e.g., Amoco Oil Co. v. D.Z. Enterprises, Inc.,* 607

F.Supp. 595, 598–600 (E.D.N.Y.1985); *Itin Oil Co. v. Mobil Oil Corp.,* 527 F.Supp. 898, 901 (E.D.Mich.1981).

2. Paragraph II stated:

II.
*Assurance of Supply*
In the event that "UNION" approves of the sale/assignment of the jobber agreement here involved, KNIGHT agrees to continue to supply DANDY pursuant to its needs, petroleum distillates at a price established as one-quarter of a cent above KNIGHT'S jobber price from "UNION." This Agreement and assurance for supply shall be as to such quantities as DANDY may require for supply of its now existing retail locations, and such other and additional loca-

18. Dandy, however, was not required to purchase any or all of its gasoline and other petroleum products from Knight.

19. Knight entered into the sale and assignment notwithstanding Unocal's warning that Dandy had purchased substantial amounts of gasoline from others and sold it at stations bearing Unocal signs and would continue to do so.

20. The sale and assignment of the jobbership agreement was subject to the approval of Unocal.

21. Although Unocal consented to the sale and assignment of the jobbership, it refused to release Dandy from any obligations under the jobbership agreement, including those imposed under paragraph 14.[3]

22. Following the sale and assignment of the jobbership, Dandy purchased from Knight only those amounts of Union 76 gasoline required to cover Unocal credit card purchases at its stations. Dandy purchased additional amounts of Union 76 gasoline only when economically advantageous.

23. Knight and Unocal operated under the assigned jobbership agreement until November 5, 1985. On that date, they executed a "Marketer Sales Agreement," amended effective June 1986, to which Dandy has never been a party.

24. The marketer sales agreement requires that Knight not sell or permit the sale of products under the brand names, trade names, or trademarks of Unocal, unless such products are purchased from Unocal or certified by a supplier to be Unocal products. If Knight violates that requirement, it risks termination of its marketer sales agreement by Unocal.

25. The marketer sales agreement added the following provision not present in the assigned jobbership agreement: "[14](d) All trademark(s), trade name(s), brand name(s) and identifications are and shall remain the exclusive property of [Unocal] and Marketer shall have no interest therein."

26. On July 18, 1986, Knight gave Dandy written notice of its intention to terminate their franchise agreement in ninety days because of Dandy's failure to purchase required amounts of Union 76 gasoline for its Unocal branded stations.[4]

27. In March, April, May and June of 1986, during the 120 day period preceding Knight's notice of termination, Dandy purchased only 27.2% of its gasoline from Knight or other Unocal suppliers.

28. In July, August and September of 1986, during the three months following the notice of termination, Dandy purchased only 16.7% of its gasoline from Knight or other Unocal suppliers.

29. Dandy intends to continue selling unbranded gasoline at its Unocal branded

---

tions as may hereinafter be established by DANDY. This paragraph shall not infer, nor be interpreted in such a manner as to require DANDY to purchase all or any of its petroleum distillate needs from KNIGHT, but shall be construed as additional consideration and shall bind KNIGHT to supply the petroleum distillates upon request and pursuant to industry established credit terms and at the price as formulated herein.

**3.** In particular, the third paragraph of the "Consent to Assignment of Jobber Sales Agreement" provided that:

Dandy and Knight agree that all terms and conditions of Jobber Sales Agreement shall remain in full force and effect, except for the modifications set forth above. Dandy and Knight further agree that Union's consent to an assignment of the Jobber Sales Agreement shall constitute neither a renewal of the Jobber Sales Agreement nor an extension of the term of the Jobber Sales Agreement. *Dandy agrees that Union's consent to this assignment shall constitute neither a novation nor a release of Dandy's obligations under the Jobber Sales Agreement;* provided, however, that Dandy shall have no responsibility to pay Union for purchases by Knight from Union. (emphasis added)

The consent agreement was signed by officers of Dandy, Knight, and Unocal.

**4.** Knight gave the following reason for its decision to terminate the franchise agreement: "In reviewing your purchases of Union gasoline you fall far short of meeting your obligation to buy the product which is identified at your branded Union stations, pursuant to the franchise relationship."

stations in the same manner as it has in the past.

30. If Knight is permitted to terminate the franchise agreement, Dandy would lose its Unocal credit card sales and incur a loss in gross profits of $15,000.00 per month.

31. Dandy also would have to remove Unocal signs from its stations and deal with the delays inherent in obtaining approval of new signs.

32. If Dandy is unable to sell Unocal gasoline to its two wholesale accounts, it would lose almost $30,000.00 in gross profits per year.

33. Knight's marketing agreement with Unocal requires Knight to enforce Unocal's trademark rights. If Knight is not permitted to terminate its franchise agreement with Dandy, it risks termination of its marketing agreement with Unocal.

## CONCLUSIONS OF LAW

1. The sale and assignment of the jobbership from Dandy to Knight created a franchise agreement, which may be terminated only in accordance with the PMPA.

■ 2. Although the Union 76 trademark remains the exclusive property of Unocal, Knight is authorized under its marketer sales agreement with Unocal to permit Dandy and other franchisees to use the Union 76 trademark in connection with the sale of Union 76 gasoline. As a result, Knight has standing to terminate the franchise agreement on the basis of Dandy's misbranding. 15 U.S.C. § 2801. There is no requirement under the PMPA that Knight be the registrant of the trademark.

3. Under the PMPA, three conditions must be met before Dandy can obtain preliminary injunctive relief: (1) the franchise has to be terminated; (2) there must exist "serious questions going to the merits to make such questions a fair ground for litigation;" and (3) the hardships imposed on Knight by the issuance of an injunction must not be less than the hardship imposed on Dandy if the injunction is denied. *Id.* § 2805(b)(2).

■ 4. The burden of proving the termination of the franchise agreement rests with Dandy, the franchisee. Knight, as the franchisor, bears the burden of establishing, as an affirmative defense to the issuance of the injunction, that such termination was permitted under Section 2802(b) or 2803. *Id.* § 2805(c); *Marks v. Shell Oil Co.,* 643 F.Supp. 1050, 1053 (E.D.Mich. 1986).

5. Section 2802(b) and (c) list the affirmative defenses available to a franchisor. Section 2802(b)(2)(C) provides:

(2) For purposes of this subsection, the following are grounds for termination of a franchise or nonrenewal of a franchise relationship:

. . . .

(C) *The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable,* if such event occurs during the period the franchise is in effect and the franchisor first acquired actual or constructive knowledge of such occurrence—

(i) not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a) of this title; or

(ii) not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 2804(b)(1) of this title. (emphasis added)

6. Subsection (c) lists twelve events that are both relevant to the franchise relationship and conclusively presumed to be reasonable. *Russo v. Texaco, Inc.,* 808 F.2d 221, 225 (2d Cir.1986). Knight seeks termination of the franchise agreement under § 2802(c)(10):

(c) As used in subsection (b)(2)(C) of this section, the term "an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise

relationship is reasonable" includes events such as—

....

(10) willful adulteration, mislabeling or misbranding of motor fuels or other trademark violations by the franchisee;

....

7. Knight's letter of July 18, 1986, constituted a notice of termination under the PMPA.

8. Knight's notification was given pursuant to § 2804(a) and, as such, can only be based on events occurring not more than 120 days prior to the notice of termination. 15 U.S.C. § 2802(b)(2)(C).[5]

9. A notice of termination must contain "a statement of intention to terminate the franchise or not to renew the franchise relationship, together with the reasons therefor." *Id.* § 2804(c)(3)(A).

10. In general, franchisors must comply strictly with the notice provision. *E.g., Moody v. Amoco Oil Co.,* 734 F.2d 1200, 1211 (7th Cir.1984).

11. The notice must adequately advise a franchisee of the specific reasons for the termination and enable the franchisee to determine whether the franchisor complied with the provisions of the PMPA. *Svela v. Union Oil Co. of California,* 807 F.2d 1494, 1498–1500 (9th Cir.1987); *Davy v. Murphy Oil Corp.,* 488 F.Supp. 1013, 1016 (W.D.Mich.1980).

12. In reviewing the adequacy of Knight's notice of termination to Dandy, this Court may consider the import of that notice on Dandy, as shown by Dandy's subsequent actions. *See Graeber v. Mobil Oil Corp.,* 614 F.Supp. 268, 276 (D.N.J. 1985).

■ 13. The fact that Knight's notice gave Dandy's purported failure to purchase sufficient amounts of gasoline as the reason for termination of the franchise, instead of misbranding and trademark infringement, does not bar Knight in this case from asserting the latter defense. Dandy was aware of its actions upon which

Knight based its termination; but for Dandy's substitution of unbranded gasoline for Union 76 gasoline, Dandy's stations would have purchased a greater share of Union 76 gasoline.

■ 14. Moreover, Dandy has not shown that it was unable to determine whether Knight complied with the PMPA. Knight stated in its notice to Dandy that it intended to terminate the franchise based on § 2802(b)(2)(C) of the PMPA. Nor can Dandy claim any prejudice due to a lack of sufficient notice. Dandy has steadfastly maintained throughout this litigation that it will continue to sell unbranded gasoline at all of its stations, including its Unocal branded stations.

■ 15. Misbranding occurs when a franchisee passes off other gasoline as that of the franchisor's by dispensing the gasoline through pumps and at stations bearing the franchisor's logo. *See, e.g., Wisser Company, Inc. v. Mobil Oil Corporation,* 730 F.2d 54 (2d Cir.1984).

16. Misbranding, for purposes of § 2802(c)(10), "contemplates a conscious, intentional, deliberate and voluntary act, and that the provision does not require 'proof of bad motive, nor does evidence of good faith negate the willfulness of an act covered by said provision.'" *L.C. Williams Oil Co. v. Exxon Corp.,* 627 F.Supp. 864, 870 (M.D.N.C.1985) (citations omitted).

■ 17. Dandy's purchase of non-Union 76 gasoline because of its availability at prices below the Union 76 gasoline offered by Knight supports a finding of willfulness. *H.R.H. Service Station, Inc. v. Exxon Co., U.S.A.,* 591 F.Supp. 25, 26 (S.D.N.Y.1983).

18. To avoid a charge of misbranding, a franchisee must "deidentify" the gasoline by removing the franchisor's logo from the pumps and station signs. *See, e.g., Lippo v. Mobil Oil Corporation,* 776 F.2d 706 (7th Cir.1985).

---

**5.** It is undisputed that Knight, at all relevant

times, had full knowledge of Dandy's activities.

19. Dandy failed to deidentify the non-Union 76 gasoline sold at its Unocal branded stations. Although Dandy removed the Union 76 logo and decals from its gasoline pumps before it sold the non-Union 76 gasoline, Dandy continued to display Union 76 signs on the poles and buildings at the stations. This Court concludes that a customer purchasing gasoline from an unmarked pump on premises bearing a Union 76 sign expects to receive Union 76 gasoline. Dandy, to avoid confusing an unsuspecting customer, should have taken affirmative steps to deidentify the gasoline, such as clearly labeling the pumps as dispensing unbranded gasoline or posting conspicuous disclaimers that non-Union 76 gasoline was being sold.

20. Dandy has not raised "serious questions going to the merits to make such questions a fair ground for litigation."

21. The hardship to Knight if the injunction is issued outweighs the hardship to Dandy in denying it. Dandy obtains gasoline from many suppliers and can offset the loss of Unocal gasoline. Dandy nevertheless would suffer some losses from the removal of the Unocal signs. Knight, on the other hand, risks the complete loss of its marketing agreement if it is unable to enforce Unocal's trademark rights.

## ORDER

IT IS HEREBY ORDERED, for the reasons set forth above, that plaintiff's motion for a preliminary injunction enjoining defendant from terminating their franchise agreement is DENIED.[6]

So ordered.

---

6. Although plaintiff's motion is denied, the case is not dismissed. Plaintiff may still prosecute its case for whatever damages it seeks.