KOYLUM, INC., Plaintiff,

v.

PEKSEN REALTY CORP., f/k/a Route Calverton Realty Corp., Successor by merger to Ridge Petroleum Realty Corp. and 1677 Ridge Road Realty Corp., Defendants.

No. CV 99–3793ADS.

United States District Court,
E.D. New York.

Sept. 30, 2002.

Law Offices of Arnold P. Azarow, Syosset, NY (Arnold P. Azarow, Kenneth L. Robinson, Of Counsel), for Plaintiff.

Law Offices of Robert G. DelGadio, Uniondale, NY (Robert G. DelGadio, of Counsel), for Defendant 1677 Ridge Road Realty Corp.

Edward A. Christensen, Oyster Bay, NY, for Defendant Peksen Realty Corp.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

The Petroleum Marketing Practices Act ("PMPA") is remedial legislation that "must be given a liberal construction consistent with its overriding purpose to protect franchisees." *Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1221 (7th Cir.1982). In enacting the PMPA, Congress intended to establish minimum federal standards for the termination and non-renewal of franchise agreements between small businesses and large oil companies. *Riverdale Enterprises, Inc. v. Shell Oil Co.*, 41 F.Supp.2d 56, 61 (D.Mass.1999), *see May-Som Gulf, Inc. v. Chevron U.S.A., Inc.*, 869 F.2d 917, 921 (6th Cir.1989) (citing S.Rep. No. 731, 95th Cong., 2d Sess. 15, reprinted in 1978 U.S.Code Cong. & Admin.News 873, 877). A primary reason for its passage was to alleviate the potential use by large oil companies of threats and coercion to force adherence to their corporate marketing policies. *Id.* Congress therefore passed the PMPA to ensure that franchisees would not suffer arbitrary or discriminatory treatment at the hands of the more powerful franchisor. *Id.*

However, the PMPA's reach should be limited because its provisions may also cause a diminution of franchisor property rights. *Chestnut Hill Gulf, Inc. v. Cumberland Farms, Inc.*, 940 F.2d 744, 750 (1st Cir.1991). Thus the PMPA should not be interpreted to reach beyond its original language and purpose. *Id.* One court has described the PMPA as a "product of compromise." *Valentine v. Mobil Oil Corp.*, 789 F.2d 1388, 1390 (9th Cir.1986). *See also Sawhney v. Mobil Oil Corp.*, 970 F.Supp. 366, 371 (D.N.J.1997) (Courts have taken care not to interpret the Act beyond its original language and purpose); *Russo v. Texaco, Inc.*, 630 F.Supp. 682, 687 (E.D.N.Y.) *aff'd* 808 F.2d 221 (2d Cir.1986)

(PMPA's remedial provision should not be unduly extended beyond the statute's express language and purpose).

This case involves a gas station located at 1677 Route 25A, Ridge, New York (the "Ridge Station") and a series of transactions with its landlords and gasoline supply company. Many of the facts set forth in the "Background" are taken from the detailed factual recitation in the Second Circuit opinion which affirmed the issuance of a preliminary injunction, *Koylum Inc. v. Peksen Realty Corp.*, 272 F.3d 138 (2d Cir.2001) and will, in part, be repeated for the purpose of clarity.

## I. *BACKGROUND*

The plaintiff Koylum, Inc. ("plaintiff" or "Koylum") has operated the Ridge Station since June 21, 1996 as a result of an assignment of a lease. The prior operator of the Ridge Station was RBP Enterprises ("RBP"). The Ridge Station, which was a Coastal Refining and Marketing, Inc. ("Coastal") branded station, was operated under two agreements: (1) the Lease Agreement dated January 1, 1994, (the "Lease Agreement") between Koylum's assignor and defendant Peksen Realty Corp. ("Peksen"); and (2) the Supply Agreement, also dated January 1, 1994, (the "Supply Agreement") between Koylum's assignor and its gasoline supplier, Ocean Petroleum Inc. ("Ocean"). Coastal is a gasoline refiner. Ocean is not a party to this lawsuit. Both agreements expire on December 31, 2011. The Supply Agreement permitted Ocean to designate a substitute supplier. It also authorized Koylum's assignor to use the brand names and trademarks designated by Ocean in connection with the sale of fuel.

Peksen and Ocean are affiliated with one another, in that both are closely held corporations owned by Refik Peksen and Mine Peksen, who are husband and wife. Ocean was an authorized distributor for Coastal and sold that brand of product to Koylum for resale at the Ridge Station.

On December 1, 1995, in a Rider ("the Rider"), Ocean and Koylum's assignor agreed to a revision of the Supply Agreement. Among other things, the Rider required Ocean to advise Koylum's assignor by fax on or before 7:00 p.m. of every weekday of the next day's prices for the gasoline being sold by Ocean to RBP. The Rider further permitted Koylum's assignor to purchase gasoline from any other open market supplier if Ocean's quoted prices exceeded the prices specified by a stated formula. The Rider further provided (1) that Koylum's assignor document its calculations justifying its exercise of the option to purchase from another supplier, and (2) that the transport of fuel by any other supplier from terminals in the Long Island and Metropolitan area to the Ridge Station be made by a firm called National Petroleum Transporters, Inc. at a specified rate.

On June 21, 1996, by assignment, Koylum became the lessee of the Ridge Station under the Lease Agreement. Also, in August 1996, with Ocean's consent, the Supply Agreement was assigned to Koylum. At that time, Erol Bayraktar and Adnan Kiriscioglu, purchased the stock of Koylum. After the assignment of the Lease and the Supply Agreement, Ocean permitted Koylum to use the Coastal brand name, and the gas station continued to operate as a Coastal gas station.

In 1997 the relationship between Koylum and Ocean/Peksen developed problems ultimately resulting in letters of termination by Peksen and Ocean, both dated October 2, 1998. The termination letters stated that both the Lease Agreement and Supply Agreement would end on October 6, 1998. The termination letters accused Koylum of purchasing unbranded gasoline from unauthorized suppliers and selling it under the Coastal trademark and brand

name; causing gasoline from an unauthorized source to be mixed in the station's underground tanks with gasoline supplied by Ocean; and using and occupying the station for the sale of gasoline not approved by Ocean and Peksen. The termination letters also stated that Koylum's purchases of unbranded gasoline for sale under the Coastal brand name constituted trademark infringement, unfair competition under the Federal Lanham Act, and false advertising and trademark dilution under New York law.

Following these termination letters flowed a series of eviction petitions brought by Peksen and 1677 Ridge Road Realty Corp., ("1677 Ridge"), its successor in the ownership of the Ridge Station. On October 7, 1998, Peksen commenced a proceeding in the District Court of Suffolk County to evict Koylum, as a holdover tenant. This eviction proceeding was stayed, and remains so stayed by stipulation of the parties, pending the disposition of this lawsuit.

On October 29, 1998, Coastal canceled Ocean's right to use its trademarks and terminated its agreement to sell petroleum products to Ocean, effective February 3, 1999. Ocean did not advise Koylum of this cancellation by its petroleum producer. On November 20, 1998, Ocean filed a Chapter 11 bankruptcy petition. In January 1999, in the Bankruptcy Court, Ocean rejected the executory Supply Agreement with Koylum. On February 25, 1999, Koylum filed a claim against Ocean in Bankruptcy Court for damages based on the rejection of the Supply Agreement. On June 18, 1999, Ocean converted its bankruptcy petition to a Chapter 7 liquidation proceeding and ceased operating.

On January 29, 1999, Peksen sent a second lease termination letter to Koylum, also based on the ground that Koylum sold non-Coastal gasoline purchased from another supplier. Peksen followed this second termination letter with another holdover proceeding in the Suffolk County District Court. This petition was dismissed in March 1999, due to the stay of the first petition.

On May 6, 1999, Peksen sold the Ridge Station to 1677 Ridge. The new owner of the station then filed another holdover eviction proceeding in District Court, followed by a non-payment eviction petition. This holdover proceeding was dismissed in July 1999.

## II. *THE PRESENT ACTION*

### A. The Complaint and Preliminary Injunction

On July 7, 1999, Koylum commenced this federal lawsuit under PMPA, 15 U.S.C. § 2801 *et. seq.* The complaint seeks declaratory relief that Peksen improperly terminated Koylum's franchise because the terms of the Rider to the Supply Agreement allowed Koylum to purchase gasoline from suppliers other than Ocean. Koylum also seeks to compel Peksen to rescind the sale of the Ridge Station to 1677 Ridge and to permit Koylum to exercise the right of first refusal with regard to the purchase of the property. According to Koylum, Peksen's sale of the Ridge Station violated the PMPA in that Peksen was required to give Koylum prior notice of the sale and the right of first refusal to purchase the premises, as stated in 15 U.S.C. § 2802(b)(3)(D)(iii). To stabilize its position, Koylum moved for a preliminary injunction, pursuant to 15 U.S.C. § 7805(b)(2), to enjoin 1677 Ridge/Peksen from continuing their eviction proceeding in the Suffolk County District Court.

After a hearing, United States Magistrate Judge Viktor V. Pohorelsky found that (1) the relationship between Koylum, Peksen and Ocean constituted a franchise relationship, within the provisions of the

PMPA; (2) it was undisputed that Ocean orally authorized Koylum to use the Coastal brand name in connection with sale of gasoline products at the Ridge Station; and (3) the parties expressly agreed in the Supply Agreement that theirs was a franchise relationship within the provisions of the PMPA.

Judge Pohorelsky recommended that a preliminary injunction be issued. He found that there were serious questions as to the propriety of the termination of Koylum with regard to both the Lease Agreement and the Supply Agreement. Citing the provisions of the Rider to the Supply Agreement, which he found to be ambiguous, Judge Pohorelsky determined that it was not unreasonable for Koylum to believe that it was authorized to purchase and sell unbranded gasoline.

In a decision dated August 28, 1999, this Court adopted Judge Pohorelsky's Report and Recommendation in its entirety and granted Koylum's motion for a preliminary injunction (1) prohibiting 1677 Ridge and Peksen from pursuing any proceedings in any forum except for the instant proceeding until this case is finally determined, or until further order of this Court; and (2) permitting Koylum to continue in possession of the Ridge Station under and subject to the provisions of the Lease Agreement dated January 1, 1994.

### B. The Second Circuit Opinion

In an opinion dated November 21, 2001, the Second Circuit affirmed the grant of the preliminary injunction under the PMPA. *Koylum v. Peksen,* 272 F.3d 138 (2d Cir.2001). The Second Circuit held that this Court had subject matter jurisdiction under the PMPA because "[t]he relationship created by the Supply Agreement falls under the statute's definition of a franchise." *Id.* at 144–45. The Court also held that "[a] franchise relationship

also arose under the PMPA from the Lease Agreement." *Id.* at 145–46.

The Second Circuit rejected Peksen's argument that "even if there was at one time a franchise relationship, no such relationship—and therefore no subject matter jurisdiction—existed at the time of the suit because of Ocean's bankruptcy and rejection of the Supply Agreement in January 1999." *Id.* at 146. In particular, the Court held that whether a franchise relationship existed when Ocean rejected the Supply Agreement was not relevant to the existence of subject matter jurisdiction because Koylum asserted the existence of a franchise and the violations of the PMPA months before Ocean's rejection of the Supply Agreement. As the Second Circuit aptly pointed out, "What matters is whether the complaint alleges a violation of the Act." *Id.* at 146. However, the Court noted, that its holding, "should not be understood to suggest that plaintiff is necessarily entitled to the relief it seeks if it proves the facts alleged. The district court might ultimately conclude, if Koylum is seeking to perpetuate only a lease and not a franchise involving the use of any franchised mark, that it is not entitled to take advantage of the Act's provision for a right of first refusal to acquire the premises." *Id.* at 146.

The Second Circuit then addressed the propriety of the issuance of the preliminary injunction. The Court found that Peksen/1677 Ridge were not prejudiced by the timing of the request for preliminary relief under the PMPA because they had notice that Koylum contested the attempted termination of the lease, and that 1677 Ridge purchased the station with "full awareness of the ongoing dispute between Peksen and Koylum concerning the sale of unbranded gasoline."

Further, the Second Circuit concluded that the "alleged misbranding" by Koylum

could not preclude the granting of preliminary injunction for the following reasons:

First, the Rider to the Supply Agreement arguably contemplated that Koylum might purchase unbranded gasoline. Second, Ocean itself had delivered unbranded gasoline to Koylum for sale under the Coastal mark. Third, Koylum claims that Ocean's failure to perform its own obligations under the Supply Agreement and Rider further freed Koylum to acquire gasoline from independent sources.... Here, it is undisputed that Koylum sold unbranded gasoline, but the issue is whether such sales violated its agreements.

*Id.* at 148.

The Court concluded its comprehensive opinion by raising the question of whether Koylum's actions constituted "willful adulteration, mislabeling or misbranding" within the meaning of § 2802(c)(10):

Here, as noted above, Koylum advances respectable arguments that its purchases of unbranded gasoline were permitted by the franchise agreement. Therefore, there are serious questions going to the merits of Koylum's contention that its actions violated neither the franchise agreements, nor the provisions of the Act.

*Id.* at 149.

### C. The Trial

The plaintiff filed a motion *in limine* for an order pursuant to 15 U.S.C. § 2805(c), directing that the defendant Peksen/1677 Ridge bear the burden of going forward with evidence to establish its affirmative defense that the termination of the plaintiff's franchise was permitted under Section 2802(b) or 2803 of the PMPA. The pertinent portion of Section 2805(c) provides:

In any action under subsection (a) of this section [a civil action by the franchisee against the franchisor], the franchisee shall have the burden of proving the termination of the franchise or the nonrenewal of the franchise relationship. The franchisor shall bear the burden of going forward with the evidence to establish as an affirmative defense that such termination or nonrenewal was permitted under section 2802(b) and 2803 of this title, and, if applicable, that such franchisor complied with the requirements of section 2802(d) of this title.

This burden of proof rule is explained in *Lippo v. Mobil Oil Corp.*, 776 F.2d 706, 720 (7th Cir.1985), as follows:

In an action brought under section 285(a), the franchisee has the burden of proving termination of the franchise. (This must really mean attempted termination if the injunctive relief is to be of any use). The franchisor then bears the burden of going forward with evidence to establish as an affirmative defense that the termination is permitted under section 2802(b).

In the plaintiff's case, Koylum offered the three notices of termination, Plaintiff's Exhibits 22 and 23 dated October 2, 1998 and Plaintiff's Exhibit 28, the January 29, 1999 Notice of Termination. Thus, the Court found that the plaintiff met the requirements of Section 2805(c), namely, it proved the termination of the franchise. *See* 15 U.S.C. § 2805(c). Accordingly, the Court granted the plaintiff's motion in regard to the burden of going forward, and the burden shifted to the defendants to establish an affirmative defense that such termination was permitted under Section 2802(b) or 2803 of the PMPA rested with the defendant franchisor, Peksen/1677 Ridge. *See* 15 U.S.C. § 2805. As will be discussed more thoroughly, Section 2802(b) sets forth the grounds for termination, and they include: (1) "A failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the

franchise relationship" and (2) "The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or non-renewal of the franchise relationship is reasonable."

The plaintiff also moved *in limine* for an order to establish that Section 2802(b)(2)(A) limited the defendants' burden of the occurrence of events relevant to the termination of a franchise relationship to a period of not more than 60 days prior to the date on which notice of termination was given, namely, October 2, 1998. The Court also granted this motion.

The defendants offered invoices from Benit Fuel Sales and Service Inc. ("Benit") to Koylum Inc. from August 29, 1997 to June 23, 1999. Some of these sales of gasoline to the plaintiff were made prior to the October 2, 1998 Notices of Termination. Defendants' Exhibit P is a chart which all parties agree is a true and accurate summary of all gasoline deliveries from Benit to Koylum at the Ridge Station between August 1997 to June 1999. The defendants then offered documents showing gasoline deliveries to Koylum from T. Hutchinson Trading Corp. (Dft. Exs. Q and R), from Ercat Corp. (Dft. Exs. U and V), and from Nassau and Suffolk Fuel Oil Corp. (Dft. Exs. S and T).

By deposition, Erol Bayraktar testified that he owns fifty percent of the stock in Koylum. He has an interest in nine gasoline stations with different brands, including the Ridge Station, which, he stated, is unbranded. Bayraktar conceded that, between August 1997 and July 1999, Koylum purchased gasoline from suppliers other than Ocean. He stated that he made these purchases because Ocean did not meet the requirements of the Rider. In particular, Bayraktar testified that Ocean did not fax the prices as provided for in the Rider, or if faxed, the prices did not meet the formula set forth in that document.

The Rider is a crucial document in this case. In this vigorously contested lawsuit, each side relies on the Rider provisions to support claims of a breach of the Supply Agreement. The Rider reads as follows:

RIDER TO RESELLER'S AGREEMENT BETWEEN OCEAN PETROLEUM, INC., AS SELLER AND R.B.P. ENTERPRISES, INC., AS PURCHASER DATED JANUARY 1, 1994

DATED: DECEMBER 1, 1995

It is agreed that the average price for all petroleum products sold by the supplier (Ocean Petroleum, Inc.) To the purchaser (R.B.P. Enterprises, Inc) by supplier shall not exceed a price greater than .005 cents above the average market price for all petroleum products sold by other legitimate and legally licensed suppliers in the open market. The average market price shall mean the sum of the price of regular unleaded gasoline plus the price of premium unleaded gasoline divided by TWO (2). Should the average market price of the supplier for all petroleum products sold to Purchaser exceed the aforesaid average market price of legally licensed and legitimate suppliers in the open market, then the purchaser may purchase any and all petroleum products from any other open market supplier.

It is further agreed that the supplier shall advise purchaser by facsimile transmission on or before 7 P.M. of each and every week day of the next day's prices for all petroleum products being sold by supplier to purchaser. In addition, Purchaser agrees to provide documentation of prices supporting its claim of excessive prices in the event purchaser exercises its option to purchase from any other supplier other than Ocean Petroleum, Inc.

It is further agreed that the transport of any and all petroleum products sold by any supplier from all terminals in the Long Island and Metropolitan area to 450 Neighborhood Rd., Mastic Beach, County of Suffolk, State of New York and 1677 Route 25, Ridge, County of Suffolk, State of New York, shall be made by National Petroleum Transporters, Inc. at a transportation rate of .0125 cents per gallon.

Bayraktar also testified that if Ocean had timely faxed the prices and they were within the formula set forth in the Rider, Koylum would have purchased the gasoline from Ocean and not from another supplier. However, he stated that he did buy gas from Coastal even when the price did not meet the Rider formula. He further conceded that he purchased non-Coastal gasoline from Benit and Hutchinson Trading at the same time he purchased from Ocean.

Bayraktar had one conversation with Frank Mascolo, the owner of 1677 Ridge, in which he told Mascolo that he would purchase gasoline from his Coastal distribution company at the formula price and Mascolo said "No". Bayraktar also had a telephone conversation with Refik Peksen in which he told Peksen that he was buying gasoline from other sources "because they were not ... faxing the prices daily so we can compare the prices. ([A]lso) when they faxed it, the price ... was not within the formula."

The testimony of Bayraktar at the preliminary injunction hearing was also read into the record. Prior to late January 1999, the Ridge Station had a Coastal sign on the pumps. Significantly, Bayraktar conceded that the Ridge Station Coastal sign was covered over with a black bag toward the end of January 1999. Also, all the Coastal signs were physically removed on March 2, 1999. In evidence are three photographs of the Ridge Station taken on July 23, 1999, which show the absence of any Coastal signs. There was no change in the appearance of the station between March 2, 1999 when the Coastal signs were removed and July 23, 1999 when the photographs in evidence were taken, except for a Food Mart sign that was erected during that time period. Further, Bayraktar testified at the preliminary injunction hearing that from January 1999 until the date of the hearing, Koylum did not contact any Coastal distributor to request gas delivery or to ask for Coastal signs to be erected.

Mine Peksen was the Vice President of Ocean, which company was a distributor of Coastal petroleum. Mine Peksen and her husband Refik, who are now separated, operated a family business which included Ocean, Peksen and National Petroleum Transporters, Inc. Ocean supplied gasoline to the Ridge Station. Mine Peksen was also an officer of Ridge Petroleum Realty Corp., the prior owner and landlord of the Ridge Station premises. The defendant Peksen is the successor to Ridge Petroleum Realty Corp., as owner of the Ridge Station property and as the landlord of Koylum. On May 6, 1999, Peksen Realty Corp. sold the premises to 1677 Ridge, which is the present owner of the premises and the landlord of Koylum. Frank Mascolo is the principal of 1677 Ridge. He is also a Coastal brand wholesale petroleum distributor.

Mine Peksen testified that from the date of the Supply Agreement on January 1, 1994, the brand of gasoline delivered to and sold at the Ridge Station was Coastal. On October 2, 1998, a Notice of Termination was sent to Koylum "based on information that we had received that they were purchasing fuel other than Ocean Petroleum" and selling the fuel under the Coastal trademark. After the notices of termination were served, Koylum continued to purchase fuel from other sources.

However, during that period, Ocean continued to offer to sell Coastal gasoline to Koylum and it "sporadically" purchased Coastal gasoline.

In or about October 1998, Koylum commenced an action in Supreme Court Suffolk County, requesting a declaration, among other things, that the Supply Agreement had been canceled by reason of Ocean's conduct; that Koylum is not restricted to purchasing exclusively Coastal brand gasoline; and that the Lease Agreement is in full force and effect.

On November 20, 1998, Ocean filed for bankruptcy under Chapter 11. On January 27, 1999, the Bankruptcy Court issued an order rejecting the Supply Agreement between Ocean and Koylum, affording Koylum the opportunity to file a claim for damages in the Bankruptcy Court.

With regard to the Rider provisions, Mine Peksen testified that there was an employee designated to fax the next day prices to Koylum. She also stated that she didn't know if it was done each day. However, Mine Peksen testified that she did not ever "receive from Koylum documentation of prices supporting its claim of excessive prices". Further, she stated that Koylum never asked National Petroleum Transporters Inc. to transport gasoline purchased from other sources to the Ridge Station. Mine Peksen is the Vice President of National Petroleum Transporters, which is the trucking company Ocean used to transport their fuel.

Mine Peksen conceded that, on several occasions, Ocean delivered non-Coastal gasoline to Coastal branded stations. In fact, that was one of the reasons that Coastal terminated Ocean's franchise on February 3, 1999. Mine Peksen testified that Ocean purchased gasoline from Rad Oil, which was not a Coastal distributor, and sold that non-Coastal gas to Koylum.

She also conceded that, within 90 days of October 2, 1998, there might have been such deliveries of non-Coastal gas from Ocean to Koylum. However, she explained that she sold non-branded gasoline not drawn from the Coastal account only with the consent of Coastal.

THE COURT: When you sold non-branded gasoline, was that with the consent of Coastal?

THE WITNESS: Yes.

THE COURT: Only with the consent of Coastal?

THE WITNESS: Yes.

THE COURT: Did you ever sell non-branded gasoline without the consent of Coastal from Koylum?

THE WITNESS: Not to a Coastal station, no.

\*    \*    \*    \*    \*    \*

Q. Well, how did Ocean determine to go to a terminal that didn't have Coastal product?

A. That would be Coastal telling us where the product was available, and if they had no product available at any of the three terminals that we used, Oceanside, Oyster Bay, Commander's terminal and the Inwood terminal, then they would tell us to try to find the product.

Q. And then you would buy the product?

A. Yes.

Q. But you knew it was non-Coastal product when you bought it?

A. We knew and they knew.

Tr. at 110, 125.\*

Mine Peksen also testified that Ocean trucks delivered non-Coastal gas to Koylum, while it was bearing the Coastal signs. She again explained that Ocean

---

\* Tr. refers to trial transcript.

was authorized by Coastal to supply non-Coastal gas to Koylum.

Q. And did you authorize National Transporters to pull 5800 gallons of unleaded gasoline and 1600 gallons of premium gasoline from the RAD Oil terminal in Oceanside?

A. Yes.

Q. And in fact, wasn't that Gulf gasoline?

A. Yes. It was out of Gulf's account at RAD's terminal.

Q. So that on this occasion, June 19th, you pulled out of the Gulf account gasoline that you knew was designated as Gulf gasoline and transported it to the Coastal station at Ridge, which at the time was, I'll say, flying the Coastal flag, if you understand it?

A. Yes.

Q. And when you pulled gas from a terminal that was not out of Coastal's account, you knew that that was not Coastal branded gasoline?

A. It was not out of Coastal's account.

Q. Well, what does that mean to you, if it was not out of Coastal's account?

A. Because on several occasions we were authorized by Coastal to pull out of accounts that were not theirs and provide to station.

Tr. at 130, 132.

Further, Mine Peksen stated that this delivery of non-Coastal gas was not "misbranding".

Q. Well, did you know that if you pulled Gulf gas, had it delivered in one of your delivery trucks to a Coastal branded station, Ridge, that you were misbranding?

A. No.

Q. You didn't know that?

A. No.

Q. That as an experienced distributor, that that would not be misbranding?

A. No.

Q. Did you know that you were mixing gas if you drew Gulf gas and had it delivered to a Coastal branded station like Koylum?

A. You're not mixing gas, sir. It's the account from which it's drawn. *All the gas is in the same tank in the terminals.* It's the account from which it is drawn from that makes a difference.

\*    \*    \*    \*    \*    \*

Q. So that as an experienced distributor, you ran your business, Ocean, Peksen, and the transportation company, under the assumption that you could pull gas from a Gulf account, deliver it to any of your Coastal branded stations, including Koylum, and that would not be misbranding?

A. Not if it was done with their permission, no, meaning Coastal.

\*    \*    \*    \*    \*    \*

THE COURT: It's your testimony that they did not object to this?

THE WITNESS: Yes, up until the October '98 letter.

Tr. at 134–36 (emphasis added).

After the bankruptcy petition was filed, the Ocean records were placed in the possession of the Bankruptcy Trustee who allowed Mine Peksen to go to her office with her attorney and obtain a single fax document, dated September 8, 1998. The single document set forth the prices for the sale of gas from Ocean to Koylum, and was faxed by Ocean to Koylum, in accordance with the terms of the Rider. (Plf.Ex. 60). Mine Peksen conceded that she located only one fax that was sent to Koylum, pursuant to the terms of the Rider.

According to Peksen, when the deliveries of fuel were paid for, the faxes were discarded. In addition, and importantly, counsel for 1677 Ridge Road did offer in

evidence a number of price faxes dating from June 28, 1997 to December 10, 1998. (Dft.Ex.F). These faxes were obtained from Koylum in discovery. There were 132 faxes in Defendants' Exhibit F. The Court notes that there are three faxes in October 1998 and no faxes in January 1999. The testimony of Peksen in regard to the faxes is of importance. In this regard, the Court finds her testimony to be candid, credible and believable.

Q. What are these documents? (Dft.Ex.F).

A. These are the faxes that were sent from Ocean Petroleum to the Coastal Ridge station indicating the prices for the fuel.

Q. And did we receive these from Koylum in discovery in this action?

A. I believe so, yes.

Q. And is each one of these pages a document that originated from Ocean Petroleum?

A. Yes.

Q. And do you recognize the handwriting on these documents?

A. Well, there's different handwriting, but for the most part, yes.

Q. Are these the handwritings, the handwriting of persons that were employed from time to time by Ocean Petroleum?

A. Yes, they are.

Q. And each of these faxes or each of these pages was intended to reflect the price of gasoline on a particular date; is that correct?

A. Yes.

Q. And they were faxed, were they not, by Ocean Petroleum to Koylum; is that correct?

A. That's what it appears to be, yes.

Q. And were there other faxes, other than are contained in Defendants' Exhibit F, for the dates that are not covered by the dates indicated?

A. I don't know.

Q. Was it part of your regular course of business to fax a price to Koylum each day?

A. There were individuals designated to do that in the office, yes.

\* \* \* \* \* \*

Q. Was there a procedure in place by Ocean Petroleum between 1997 and 1999 to fax pricing to Koylum?

A. Yes.

Q. Was that procedure a procedure to fax prices to them on a daily basis?

A. Yes.

Q. And by daily, we're talking about weekdays, Monday through Friday?

A. Yes.

Q. And was there a person assigned the responsibility of faxing prices on a daily basis?

A. There was one individual, different individuals over that period of time, but one individual. Yes.

Q. These are—the faxes that you have before you are the only faxes that you've been able to locate to evidence the faxing of prices by Ocean to Koylum; isn't that correct?

A. Other than the one we found at the trustee's office.

Tr. at 244–47.

It was conceded by counsel for the defendant 1677 Ridge that there was no fax dated September 30, 1998 and October 1, 1998. In addition, there were only five faxes for the entire month of September 1998. However, Mine Peksen stated, that "Sir, this is not a complete set of records from that time. There may be other faxes that are not included in this package, . . . probably in the trash. We did not hold on to these." (Tr. at 324). The Court credits this testimony.

Mine Peksen testified that Koylum violated the terms of the Rider in (1) not

providing documentation to Ocean of the prices they paid for the non-branded gas and from whom they purchased the gas, and (2) not transporting the non-branded fuel by National Petroleum Transporters. The Rider stated that Koylum should use National Petroleum Transporters Inc. to deliver all non-Coastal gas. Koylum concedes that it did not do so.

Mine Peksen attempted to excuse the failure to send the faxes required by the Rider by stating that, if no fax was received, Koylum could have called on the phone to obtain the prices. The Court finds there was no such obligation on the part of Koylum in the Rider. The obligation was on Ocean to fax the prices "each and every weekday". Ocean was reminded of this obligation in a letter written by Koylum to Ocean on August 27, 1997.

This letter, sent by certified mail, (Plf.Ex.11) stated:

8/27/97

Ocean Petroleum

4129 Middle Country Road

Calverton N.Y. 11933

To Whom It May Concern

This letter is to remind you that according to the "Supply Agreement" we have with you, you are required to fax next day's gasoline cost prices to us before 7:00 p.m. every day.

Our new office fax number is: (516)462–6642

Thank you in advance for your cooperation.

With regard to the termination notice, which gave Koylum only four days notice, Peksen stated that she relied on the termination provisions in the lease rather than the notice provisions in the PMPA. The Court will discuss the termination notice later in the opinion.

Peksen went out of business in 1999, "probably in the third quarter of 1999,"

because of personal creditors and personal guarantees. All three Peksen properties were sold on or about May 6, 1999, to a company in which Frank Mascolo is the principal. The sale included the Ridge Station property. The Koylum lease was assigned to 1677 Ridge, the present owner of the Ridge Station property.

The lease agreement (Dft.Ex.A) includes provisions that are material to the issues in this case. Initially, the Court notes that the Lease expressly refers to the Supply Agreement, as follows:

Section 2.10. Purchase Agreement: means the Agreement dated January 1, 1994 between Ocean Petroleum Inc., as Seller, and Tenant, as Purchaser, under which Tenant has contracted to purchase all of its requirements of Gasoline to be sold at the Demised Premises.

Section 5.04 of the Lease is entitled "Signs". Subdivision (b) of that section provides as follows:

(b) (i) It shall be considered a material breach of this Lease if Tenant sells, markets or dispenses any brand of Gasoline other than the brand supplied under the Purchase Agreement and other than the brand indicated by the signs approved by landlord.

(ii) Notwithstanding the provisions of Article XIII *in the event Tenant sells, markets or dispenses any brand of Gasoline other than the brand supplied under the Purchase Agreement, Landlord shall have the right to terminate this Lease on two (2) days written notice.* The provisions of Article XIII which apply to recapture, renting or repossession of the Demised Premises shall apply if this Lease is terminated as set forth in part (i) of this subsection 5.04(b). (Emphasis added).

Also relevant is Section 7.03, entitled "Purchase of Petroleum Products" and reads as follows:

Section 7.03. Purchase of Petroleum Products:

(a) In order to induce Landlord to enter into this Lease, Tenant covenants and agrees that during the term of this Lease, Tenant shall not nor permit others to store, handle, sell, offer for sale, advertise for sale, use or permit to be used upon the Demised Premises or any part thereof or any premises adjacent thereto over which Tenant has control any Gasoline, oil or other petroleum product not supplied by Seller under the Purchase Agreement.

(b) In furtherance of Tenant's covenants contained in subsection (a), Tenant agrees to enter into the Purchase Agreement simultaneously with the execution of this Lease.

(c) Landlord shall not be liable by any failure of Seller under the Purchase Agreement ("Seller") because of (i) any rationing provisions imposed upon Seller or upon such company as Seller has designated (ii) by reason of reduction in supply (iii) failure of Seller or such company as Seller may designate to supply such products (iv) from disturbance or interruption of any means of transportation customarily used in making deliveries to Tenant of (v) through acts of God, strikes, lockouts, or other labor disturbances, fires, explosions, accidents, riots, civil commotions, acts of war or restrictions, provisions of preventions imposed by governmental authorities.

In testimony concerning the main thrust of the defendants' defense in this case, Mine Peksen stated their position that the plaintiff Koylum had itself breached the provisions of the Rider.

Q. Now, during the period of time after Mr. Kiriscioglu and Mr. Bayraktar were purchasing fuel oil from sources other than Ocean, did they ever advise you that they were purchasing fuel from any other sources?

A. No.

Q. Did they ever provide to you documents indicating the prices for fuel that they were purchasing from other sources?

A. Not to my knowledge, no.

Q. Did they ever provide you with any of the trucking manifests for other fuel that they were buying from other sources?

A. No.

Q. And did they ever contact National Petroleum Transportation to arrange for delivery of fuel from other sources?

A. No. Tr. at 238.

Also, paragraph 8 in the Supply Agreement (Dft.Ex.B) states the following:

Seller's designated brand names, trademarks, logos, insignias or other identifying symbols shall be maintained by purchaser on said products and on all facilities on or in which they are handled, unless seller gives permission to purchaser in writing to sell such products on an unbranded basis.

There was never any consent given by Coastal or Ocean to operate under any other mark or under no mark.

In addition, paragraph 9 of the Supply Agreement provided that the Ridge Station operator would not use any gasoline products other than supplied by Coastal. No consent by Coastal or Ocean was ever given to Koylum to use unbranded gasoline, except of course, as delivered by Ocean or under the terms of the Rider.

Erol Bayraktar conceded that Koylum received all these faxes and paid for each delivery of gasoline. These faxes were kept in his office and "are all the faxes that I received within that period." As stated

above, Koylum sent a reminder letter to Ocean on August 27, 1997 (Plf.Ex.11) with regard to the requirement to fax daily prices. The letter also gave Ocean the new Koylum fax number. Although Koylum contends that, after August 27, 1997 to October 1998, a period of 13 months, it did not get a fax every day, it never sent another such letter to Ocean. Nor did Koylum ever send a letter to Ocean complaining that no faxes were received. In fact, there is no evidence that Koylum ever orally complained of failing to receive the daily faxes.

Mine Peksen also described the method by which Coastal obtained its gas from terminals it shared with other oil companies. Apparently, the oil companies all store their product in the same terminal. Frequently Coastal did not have fuel in a particular terminal and, in that situation, Coastal gave Ocean permission to obtain gas from other terminals.

On January 29, 1999, Mine Peksen wrote to Koylum (Plf.Ex.40) calling to its attention certain lease provisions, namely, Sections 5.04(b)(i), 5.04(b)(ii) and 7.03(a). The letter also notified Koylum of alleged violations of the Supply Agreement, as follows:

By reason of you having stored, handled, sold, marketed and dispensed gasoline that has been supplied by someone other than Ocean Petroleum, Inc. under the Purchase Agreement it had with you; to wit: as recently as January 26, 1999 when a gasoline delivery truck of Ark Transportation, tractor number TX6834, trailer number 731891 was observed delivering gasoline to your station at about 5:30 p.m. This delivery is not the first. Moreover, on at least another occasion and on October 7, 1998, you had 8,500 gallons of gasoline delivered by Mystic Bulk Carriers, Inc. which was purchased from Benit Fuel Sales and Services which you sold from the premises.

Accordingly, notice is hereby given that on two days from the date of this letter your lease shall terminate. You are thereby expected to vacate the premises and remove all of your personal property.

In the interim, you should be further advised that the underground storage tanks and related piping, the gasoline dispensing pumps and signs are not owned by you and you have no right to use that equipment for any purpose whatsoever, including the storage, supply, sale or offering for sale gasoline you purchase form any source other than Ocean Petroleum, Inc.

Moreover, the sign is owned by Ocean Petroleum, Inc. and by selling gasoline provided by another source as Coastal gasoline you may be violating Coastal's trademark rights.

Therefore you are required to immediately cease and desist from any use of the equipment at the premises.

At no time did Koylum request permission from Ocean to sell gasoline other than Coastal gas. Notwithstanding this failure to obtain consent, Koylum purchased gas from other distributors, such as Benit, T. Hutchinson Trading Corp., Ercat Corp. and Nassau and Suffolk Fuel Oil Corp.; it stored the non-Coastal gasoline at the Ridge Station when it had Coastal markings; and then unilaterally removed the Coastal markings. The record is replete with documents showing Koylum's purchase of gasoline from distributors other than Ocean. With regard to non-Coastal purchases, no documents of any kind, as to price or otherwise, were ever sent by Koylum to Peksen or Ocean, in violation of the Rider provisions. Further, none of these deliveries were made by National Petroleum Transporter Inc. Ocean wanted the provision inserted in the Rider with regard to National Petroleum Transporters to "in-

sure the integrity of the product that was picked up." (Tr. at 234). Failure to use National Petroleum Transporters to deliver the non-Coastal gasoline was also a violation of the Rider provisions.

Erol Bayraktar also testified in person. The Ridge Station sells gasoline from underground storage tanks. It also has a small convenience store, and a repair facility which is leased to a third party. Koylum operates the gas station and the convenience store.

On August 2, 1996, Bayraktar and Kiriscioglu purchased the stock of Koylum, including ownership of the Ridge Gas Station. He stated that he and Adnan Kiriscioglu are equal shareholders and officers in Koylum Inc. When they purchased the Ridge Station it was exhibiting Coastal gas signs. He was shown the Lease (Dft.Ex.A) and, in particular, directed to Section 5.04 subparagraph (b) which reads as follows:

> (b) (i) It shall be considered a material breach of this Lease if Tenant sells, markets or dispenses any brand of Gasoline other than the brand supplied under the Purchase Agreement and other than the brand indicated by the signs approved by landlord.
>
> (ii) Notwithstanding the provisions of Article XIII in the event Tenant sells, markets or dispenses any brand of Gasoline other than the brand supplied under the Purchase Agreement, Landlord shall have the right to terminate this Lease on two (2) days written notice. The provisions of Article XIII which apply to recapture, renting or repossession of the Demised Premises shall apply if this Lease is terminated as set forth in part (i) of this subsection 5.04(b).

Bayraktar testified that the first Koylum purchase of gasoline from a source other than Ocean was on August 29, 1997. He conceded that between August 1997 and "today," he sold gasoline other than Coastal product:

> Q. Okay. And, sir, did you sell and dispense gasoline from the station at 1677 Route 25, Ridge, other than that which was supplied to you by Ocean Petroleum?
>
> A. Yes.
>
> Q. And did you sell that gasoline under a brand other than that which was approved by the landlord?
>
> A. Would you repeat the question?
>
> Q. Did you sell that gasoline that you purchased from a source other than Ocean Petroleum from the station under a brand other than that approved by the landlord?
>
> A. Yes.
>
> Q. And, sir, did you understand that that activity was a breach of this lease agreement?
>
> MR. AZAROW: Objection, your Honor.
>
> THE COURT: Overruled.
>
> A. I didn't think it was a breach of the agreement.

Tr. at 10–11.

Bayraktar's attention was also drawn to Section 7.03 of the Lease, which provides:

> Section 7.03. Purchase of Petroleum Products:
>
> (a) in order to induce Landlord to enter into this Lease, Tenant covenants and agrees that during the term of this Lease, Tenant shall not nor permit others to store, handle, sell, offer for sale, advertise for sale, use or permit to be used upon the Demised Premises or any part thereof or any premises adjacent thereto over which Tenant has control any Gasoline, oil or other petroleum product not supplied by Seller under the Purchase Agreement.

He also conceded selling gasoline at the Ridge Station "which gasoline was not supplied under the Purchase Agreement."

Q. And have you in fact caused gasoline to be used at 1677 Route 25, Ridge, New York, and sold from 1677 Route 25, Ridge, New York, to motorists, and which gasoline was not supplied under the purchase agreement?

A. I can't answer yes or no.

Q. And why can't you answer yes or no?

A. For the same reason. The purchase agreement allowed me to buy gasoline other than supplied by Ocean Petroleum.

Q. Well, was that gasoline—

A. Under certain conditions.

Q. Was that gasoline supplied by Ocean Petroleum?

A. No.

Tr. at 12.

Bayraktar also conceded that Koylum purchased gas from Benit Fuel Sales & Service Inc. and resold it at the station to motorists between August of 1997 and June of 1999, as reflected in Defendants' Exhibit P. Koylum also purchased gas from T. Hutchinson Trading Corp., which gas was delivered to the station and sold to motorists from November 1998 to January 1999, as reflected in Defendants' Exhibit R; from Nassau Suffolk Fuel Oil in July 1999, as reflected in Defendants' Exhibit T; and 9200 gallons from Ercat Corp. on June 17, 1999, as reflected in Defendants' Ex. V. In all of these purchases by Koylum the non-Coastal gasoline was delivered to the Ridge Station and sold to motorists.

Also, since July 1999, Koylum has been buying gasoline from various sources, other than Coastal, and selling to motorists at the Ridge Station. Bayraktar explained that Koylum purchased gasoline from sources other than Ocean because Ocean did not fax the prices or the prices were not in accord with the formula set forth in the Rider.

Interestingly, at the hearing before Magistrate Judge Pohorelsky, Bayraktar testified that his normal procedure for ordering gas from June 1997 through December 1998, if Koylum did not receive a fax from Ocean, was to receive a fax and purchase from Benit Fuel.

THE COURT [Judge Pohorelsky]: And what time did you get there in the morning?

THE WITNESS: Usually around 8 o'clock, 8:00 to 9:00. So our routine is my [sic] 7 p.m., usually most of the time we did not receive any faxes from Ocean Petroleum. So the next thing we do is following morning we—almost every day we receive a fax from Benit Fuel, and when we don't have any reference to compare Benit's prices to Ocean, we purchased from Benit.

At this time Bayraktar knew that Benit Fuel was not an authorized Coastal distributor and yet Koylum purchased Benit gasoline and sold it to motorists under the Coastal brand. In evidence are three delivery tickets from Benit Fuel covering deliveries to the Ridge Station on September 11, 1997, October 1, 1998 and October 7, 1998 (Dft. Exs. AR6, AS and AT). In this regard, Bayraktar explained about the timing of the removal of the Coastal signs:

Q. And you knew, sir at some point in time, in January, enough to cover over the Coastal sign; is that not correct.

A. Yes.

Q. And you did also remove the word "Coastal" from the sign on the building itself and put in a sign that says "food mart"; isn't that correct?

A. Yes.

Q. So when somebody came to the station after January of 1999, they would not know what brand of gasoline was

being sold from the station, is that not correct?

A. Yes.

Q. Now when you got a delivery from Benit, Nassau Suffolk, Hutchinson or one of the other suppliers you were buying gasoline from, did you ever put a sign on the dispensing pumps to tell people that this is not a Coastal product?

A. We took the signs off.

Q. Before you took the signs off, before January of '99, did you ever put a sign on the dispensing pumps to tell motorists this is not a Coastal product?

A. No, I don't think so.

Tr. at D26–D27.

After receiving the two October 2, 1998 termination letters on or about October 16, 1998, Koylum commenced an action in Supreme Court, Suffolk County. The complaint in this action, among other demands for relief, seeks a judgment declaring that the Supply Agreement be deemed void or unenforceable by reason of Ocean's conduct.

Between January 1999 and the present time, Koylum has not taken any action to become a branded station. At the present time Bayraktar operates eight gasoline stations, of which all are branded stations except for the Ridge Station. As to all of his branded stations, he purchased all of his gasoline requirements from the brand supplier. He does not buy gasoline from Benit Fuel because its gasoline is cheaper and "deliver it into a Mobil station or Shell station or an Exxon station." Bayraktar conceded that he knew the Petroleum Marketing Practices Act prohibited a branded station operator from selling gasoline supplied by someone else other than the refiner of his brand.

Bayraktar was questioned closely about the terms of the Rider. In particular, he was asked about the clause requiring documentation of prices, which provides:

In addition, purchaser agrees to provide documentation of prices supporting its claim of excessive prices in the event purchaser exercises his option to purchase from any other supplier other than Ocean Petroleum, Inc.

Bayraktar conceded that he had not seen any "documentation of prices" supporting Koylum's claim of excessive prices by Ocean.

Q. Did you ever provide documentation of prices supporting your claim of excessive prices to Ocean at any time between August of 1997 and January 1999?

A. I personally don't remember.

Q. Have you seen any such documentation that you provided to Ocean in preparation of coming to trial here today?

A. No.

Q. Have you discussed with your partner, Adnan Kiriscioglu, if he has any such documentation of prices supporting your claim of excessive prices that you provided to Ocean?

A. He told me that he faxed at least one document and that he spoke to them on the phone.

Q. But you did not?

A. I did not.

Q. Do you have that one document?

A. I think it was one of the faxes that was faxed to them. That was one of the faxes that Mine Peksen found in the trustee's office.

Q. You agree you made a number of different purchases from sources other than Ocean; is that correct, sir?

A. Yes.

Q. And with respect to each of those purchases, you did not fax to Ocean documentation of the prices supporting your claim that the Ocean price was excessive, did you?

A. I couldn't.

Q. Did you or did you not?

A. I could not.

Q. You did not?

A. I didn't have—if I didn't have Ocean's fax, how could I prove the difference?

Q. Before you purchased from Benit, did you ever send Benit's prices to Ocean and say "these are the prices that I received from Benit. If you don't sell to me at this price, plus the half a penny, then I'm going to buy from Benit"?

You never provided that to Ocean, did you?

MR. AZAROW: Objection, your Honor.

THE COURT: Overruled.

A. I don't remember any.

BY MR. DEL GADIO:

Q. And you know you are here in court today for this trial; is that correct?

A. YES.

Q. If you had such documentation, would you have brought it to court today:

A. Yes.

Tr. at D44–D45.

In addition, Bayraktar was queried about the third paragraph in the Rider, which reads:

It is further agreed that the transport of any and all petroleum products sold by any supplier from all terminals in the Long Island and Metropolitan area to 450 Neighborhood Rd., Mastic Beach, County of Suffolk, State of New York and 1677 Route 25, Ridge, County of Suffolk, State of New York, shall be made by National Petroleum Transporters, Inc. at a transportation rate of .0125 cents per gallon.

Bayraktar conceded that Koylum did not attempt to transport the non-Coastal gasoline by National Petroleum Transporters, Inc.:

THE COURT: You understood what that meant, didn't you?

THE WITNESS: Yes.

THE COURT: You understood it then and you understand it now?

THE WITNESS: Yes.

THE COURT: It means clearly that if you do order any petroleum products sold by any supplier from any terminal, you should use National Petroleum Transporters to transport it. It's unambiguous and clear, correct?

THE WITNESS: Yes.

MR. DEL GADIO: May I proceed, your Honor?

THE COURT: Yes.

BY MR. DEL GADIO:

Q. Sir, did you, in connection with any of the purchases you made with Benit, before December 1, 1998, use National Petroleum Transporters as the company to transport the gasoline to 1677 Route 25, Ridge, New York? Yes or no?

A. No.

Tr. at D48–D49.

Ocean attempted to enforce the transportation and documentation provisions in the Rider. On September 11, 1997, Refik Peksen, as President of Ocean, wrote a letter to Koylum (Plf.Ex.12), which stated:

Koylum Inc.

1677 Route 25

Ridge, NY

ATT: Adnan Kiriscioglu and Erol Bayraktar

Dear Sirs:

In furtherance of our discussions earlier this morning, attached please find a copy of the Rider to Reseller's Agreement which you took assignment of. Please note the highlighted sections of that agreement as attached. As you are well aware, the intent of this rider was to insure that all products delivered to

the site would be transported by National Petroleum Transporters, Inc. ("NPT") at the set forth rates and in the event you exercise your option to purchase elsewhere, in addition to having NPT transport, you must provide documentation supporting your claim to excessive pricing. *Please be advised that you have failed to adhere to these requirements and continuance of these actions will cause a default of your supply agreement as well as your Lease agreement.*

Your prompt attention to this matter is requested. (Emphasis added).

Bayraktar explained that he did not violate the provisions of the Rider because (1) the Rider provided that if Ocean did not meet certain criteria "my agreement allowed me to go and buy gasoline from outside," and (2) "Ocean itself delivered unbranded gasoline to the station." Further, he stated that in the October 2, 1998 Notices of Termination, there was no reference to Koylum's failure to use National Petroleum Transporter to deliver gas to the station. Bayraktar offered two reasons for Koylum's failure to use National Petroleum Transporters, Inc. to deliver the non-Coastal gasoline. First, because Ocean did not fax the prices, "they broke our supply agreement in the first place." Second, Koylum attempted to use National "but Benit Fuels didn't want to do it."

Bayraktar also stated that the reason Koylum purchased gasoline from other sources on September 11, 1997, October 1, 1998, October 7, 1998 and/or January 4, 1999 was because it did not receive a fax indicating the Coastal prices. Koylum relied on the Rider provision when it purchased non-Coastal gasoline. Even though Koylum believed that Ocean violated the Rider provision by not faxing prices on a daily basis, nevertheless it continued to purchase gasoline from Ocean in 1998. Fax or not, Koylum continued to purchase gasoline from Ocean until it no longer wanted to operate under the Coastal brand.

Q. Did you believe because Ocean had not faxed the prices and you considered they broke the supply contract, that you were free from performing under that supply contract?

A. Yes, according to the supply agreement.

Q. But nonetheless, even though they didn't fax you the prices in '97, in '98, you still bought gasoline from them, did you not?

A. Yes.

Q. And you bought gasoline from them because you wanted that Coastal brand at the station; isn't that correct?

A. Correct.

Q. But then there came a point in time you didn't want the Coastal brand at the station anymore; isn't that correct?

A. Not correct.

＊　＊　＊　＊　＊　＊

Q. You did remove or cover over the sign, didn't you?

A. Yes, I did.

Q. And you did remove the signs, did you not?

A. Yes.

Q. And in March you removed the signs, in March of 1999?

A. Yes.

Q. And today is December 28th, 2001, more than two and a half years after you removed the signs; isn't that right?

A. Yes.

Q. And you operated as an unbranded station without a brand; isn't that correct?

A. Yes.

Q. And you considered yourself relieved of any responsibility for performing under the contract?

**424**

A. I don't know what you mean by that.

Q. You don't feel that you are bound as of today to any of the terms and conditions of that supply contract, do you?

A. I think we are allowed right now by the Court order, anyway.

Q. You are allowed what?

A. *We're allowed to live with the lease without the supply agreement, perform business.*

THE COURT: He's allowed to live with the lease without the supply agreement, he said.

Tr. at D76–D77 (emphasis added).

Adnan Kiriscioglu testified by deposition. He stated that the only reason Koylum purchased gasoline from non-Coastal sources was because of Ocean's failure to fax prices.

Question: With respect to the purchases of gasoline that you made from sources other than Ocean, from some point in time from 1997 until the time that the Coastal sign was covered over, you bought gasoline from sources other than Coastal; is that correct, sir?

Answer: Other than Coastal or other than Ocean:

Question: Other than Ocean.

Answer: Yes.

Question: Sir, why did you do that?

Answer: In the purchase agreement there was a rider which is saying that they should fax us the prices by 7 p.m. for next-day gasoline prices. And there was a formula which it should meet from Ocean. There was times they didn't fax it and there was times they faxed it late, or even if they faxed it, it wasn't meeting the formula of the rider.

\* \* \* \* \* \*

Question: Sir, were there any reasons other than that which you have just given us, did not fax or the fax came in late or that the price did not meet the formula as described in that, that led you to buy gasoline from a source other than Ocean:

Answer: Yes.

Question: What were the other reasons?

Answer: I am sorry. I didn't understand the question.

Question: Other than those three things that you told us—one, they did not fax, or two, they faxed late, or three, that the price of Ocean for the gasoline did not meet the formula in that rider—were there any other reasons that you had for going and buying gasoline from some other source?

Answer: Which time frame?

Question: Between 1997 and before the signs were covered over.

Mr. Azarow: March 2, 1999.

Mr. Del Gadio: I think it was December or January when they were covered over.

Answer: Is there any reasons? No.

Question: If you received a fax on time and the price from Ocean to Koylum was not in excess of .005 cents above the average market price for all supplies in the open market, would you have purchased all of your requirements for gasoline from Ocean?

Answer: Yes.

Question: You would have sold that gasoline as Coastal branded gasoline; is that correct, sir?

Answer: Yes.

Tr. at D90–D91.

It is undisputed and the Court also finds that at a period in time Koylum sold non-Coastal gasoline, when the Coastal signs were still in place, it did not inform its customers that they were purchasing non-Coastal gasoline. The Court also finds that such activity by Koylum took place in

the sixty-day period prior to October 2, 1998.

Koylum first learned that the 1677 Ridge Road property was sold when it received a letter from Peksen on May 6, 1999 (Plf.Ex.30), advising it that the property was sold that day to 1677 Ridge. Koylum was given no right of first refusal to purchase the property.

Frank Mascolo is the owner and President of 1677 Ridge, the owner of the Ridge Station premises and the landlord of Koylum. In addition, he is a Coastal distributor which sells Coastal and unbranded products. He also operated three gasoline stations. Prior to the purchase of the premises, 1677 Ridge knew that there was a controversy between Koylum and Peksen Realty. At the time of the closing of his purchase of the Ridge Station he knew that there was a Supply Agreement in existence and that Koylum was in default of both that agreement and the lease provisions. He agreed to take possession of the property subject to the holdover tenant, Koylum. At the time he purchased the Ridge Station, Mascolo had no knowledge that Koylum had a claimed right of first refusal, but he knew that the Supply Agreement was in existence and that it constituted a franchise agreement between Koylum and Ocean.

Mascolo is familiar with a custom and practice in the petroleum industry with regard to the de-identification of gasoline stations:

Q And what is that custom and practice:

A If you were buying products other than what your supplier is bringing in, you would have to cover over whatever identifying signs that are on the station that you are not using.

Q Do you understand the purpose of that, sir?

A Not to deceive the public.

Q And do you know, that type of custom and practice, is it applicable to branded stations?

A Yes.

Tr. at D138.

After he purchased the 1677 Ridge Road property, Mascolo met with Erol Bayraktar on two occasions. In the second meeting in front of the Suffolk District Court in June 1999 Mascolo offered Bayraktar an opportunity to stay if "he would brand the station Coastal." Bayraktar insisted on a "formula" as to price, similar to that contained in the Ocean Supply Agreement, which condition Mascolo would not accept.

On May 28, 1999, 1677 Ridge sent a letter to Koylum (Dft.Ex.AG) detailing certain obligations of the tenant, including the maintenance of Coastal signs and the sale of Coastal gasoline. On July 15, 1999, 1677 Ridge sent a five-day termination letter to Koylum. On November 4, 1999, there was a stipulation entered into between counsel for the parties, which included, among other provisions, the following:

> With respect to item number 9 in the notice of motion, the appeal to the Appellate Term of a New York State District Court judgment, we have agreed that all state court proceedings between 1677 Ridge road Realty Corp. and Koylum, Inc. shall be discontinued with prejudice and that the parties shall agree to accept this Court's determination as to the efficacy of the notice of termination of either the purchase agreement, or the lease agreement to the extent that this Court retains subject matter jurisdiction and have the power and authority to make a determination.

### III. *DISCUSSION*

As noted above, Koylum seeks declaratory relief that Ocean/Peksen improperly terminated the franchise, and that it has a

right to first refusal to purchase the Ridge Station. Koylum concedes that it purchased and sold non-Coastal gasoline to motorists while the Ridge Station was bearing Coastal brand signs. These unauthorized purchases of non-Coastal gasoline sold under the Coastal brand name commenced in August 1997 and continued until January 1999, when the Coastal signs were covered. These deceptive acts clearly are violations of the PMPA, the Supply Agreement, and the Lease Agreement and would justify terminating the franchise. However, Koylum contends that its conduct was proper, and thus Peksen/Ocean's termination was improper, under the terms of the Rider to the Supply Agreement because (1) Ocean/Peksen violated the terms of the Rider in that it failed to fax the daily price; and (2) Ocean itself sold Koylum non-Coastal gasoline. Therefore, the questions presently before the Court are (1) whether Ocean/Peksen failed to fax the daily price and sold non-Coastal gasoline to Koylum; and (2) whether such conduct justified Koylum's purchase and sale of unbranded gasoline under the Coastal signs and its failure to use National Petroleum Transporters. Before the Court addresses these issues, it is necessary to address the short period of time between the date on which Peksen/Ocean sent the termination notices and the date of termination.

## A. The Termination Notices

■ Initially, the Court will address the fact that Ocean/Peksen did not give Koylum 90–days notice of the termination of the Supply and Lease agreements. Generally, a franchisor must furnish notification of a termination to the franchisee "not less than 90 days prior to the date on which such termination takes effect." 15 U.S.C. § 2804(a)(2). However, the 90–day notice requirement does not apply if it would not be "reasonable for the franchisor to furnish notification." 15 U.S.C. § 2804(b)(1). In that event, the franchisor is required to give notice "on the earliest date" that is "reasonably practicable." 15 U.S.C. § 2804(B)(1)(a). In *Wisser Co., Inc. v. Mobil Oil Corp.*, 730 F.2d 54, 60 (2d Cir.1984), the Second Circuit upheld an immediate termination of a franchise agreement where the franchisee was misbranding gasoline. The Court found that the franchisee was "committing a serious violation of Mobil's contract and property rights and it was perpetrating a fraud on the public" and, therefore, a forthwith termination was justified. *Id.; see Marathon Petroleum Co. v. Pendleton*, 889 F.2d 1509, 1513 (6th Cir.1989) (10 days notice was adequate where the franchisee (i) had a "declining interest in operating the station," (ii) failed to "maintain adequate gas supplies," and (iii) was "chronically late" in his payments to the franchisor); *Desfosses v. Wallace Energy, Inc.*, 836 F.2d 22, 29 (1st Cir.1987); *Estate of Handy v. R.L. Vallee, Inc.* 993 F.Supp. 236, 239 (D.Vt. 1998) (franchisee's misbranding allowed for immediate termination); *Zipper v. Sun Co., Inc.*, 947 F.Supp. 62, 68 (E.D.N.Y. 1996) (*Wisser* upheld the immediate termination of a franchise agreement where the franchisee was misbranding gasoline); *Shell Oil Co. v. Wentworth*, 822 F.Supp. 878 (D.Conn.1993) (Shell was justified in taking steps to stop this practice and to disassociate Wentworth from Shell immediately.); *Murphy Oil USA, Inc. v. Brooks Hauser*, 820 F.Supp. 437, 443 (D.Minn. 1993) (14 days notice of termination was justified in order to prevent further losses to the franchisor when franchisee was plummeting further and further into arrears). *Cf. Escobar v. Mobil Oil Corp.*, 522 F.Supp. 593 (D.Conn.1981), *rev'd on other grounds*, 678 F.2d 398 (2d Cir.1982) (holding that the provision of 48 hours notice of termination for the non-payment of rent was inadequate).

This material violation of the Supply Agreement and the Lease, by selling non-Coastal gasoline under the Coastal signs, is to be distinguished from other violations which would not permit an accelerated notice of termination. *See for example, Zipper v. Sun Co., Inc.,* 947 F.Supp. 62 (E.D.N.Y.1996) (franchisee owed a disputed amount of money); *Bent v. Leeman Oil Co.,* 849 F.Supp. 1180 (E.D.Mich.1994) (landlord no longer wanted franchisee as Tenant).

Here, Ocean/Peksen had evidence that Koylum materially breached the Supply Agreement and the Lease by selling non-Coastal gasoline under the Coastal signs. An accelerated notice of termination was proper under such circumstances because the franchisee's alleged conduct violated Ocean/Peksen's property rights and perpetuated a fraud on the public. *See Wisser* 730 F.2d at 60.

## B. As to Whether Koylum's Misbranding is Grounds for Termination of the Franchise Under the PMPA

■ The grounds for termination of a franchise are set forth in 15 U.S.C. § 2802(b)(2), and include the following:

(A) A failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship....

(C) The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable....

The Second Circuit has held that the misbranding provision in a franchise agreement is "reasonable" and "material" within the meaning of 15 U.S.C. § 2802(b)(2)(A) and that "passing off" other gasoline as that of the oil company's gasoline is a ground for termination under the PMPA. In *Wisser Co. v. Mobil Oil Corp.,* 730 F.2d 54, 57 (2d Cir.1984), this cardinal rule in PMPA law is clearly stated:

That such conduct ("passing off" the non-Mobil gasoline as Mobil gasoline) is a ground for termination of the franchise under the contract and under the PMPA cannot seriously be disputed. It is a violation of a provision of the contract that is both "reasonable" and "material" within the meaning of 15 U.S.C. § 2802(b)(2)(A), and it is specifically identified as "an event ... relevant to the franchise relationship" and justifying termination within the meaning of 15 U.S.C. §§ 2802(b)(2)(C), 2808(c)(10) and 2802(c)(11).

\* \* \* \* \* \*

This is not a minor or technical violation that would suggest the type of arbitrary or discriminatory termination or overreaching by a franchisor that the PMPA was designed to prevent. *See also Shell Oil Co. v. Wentworth,* 822 F.Supp. 878 (D.Conn.1993); *Amoco Oil Co. v. D.Z. Enterprises, Inc.,* 607 F.Supp. 595 (E.D.N.Y.1985); and *H.R.H. Service Station, Inc. v. Exxon Co., U.S.A., Div. Of Exxon Corp.,* 591 F.Supp. 25 (S.D.N.Y.1983).

In *Amoco Oil Co. v. D.Z. Enterprises, Inc.,* 607 F.Supp. 595, 600 (E.D.N.Y.1985), the court discussed the *Wisser* decision and noted that the Court held "that misbranding by the franchisee retailer not only was a ground for termination, *but under the PMPA was a ground for termination forthwith.*" *Amoco,* 607 F.Supp. at 600 (citations omitted) (emphasis added). The court further held that "[t]he *Wisser* Court explicitly held that the misbranding is conduct that does not warrant a chance to cure under the PMPA." *Id.* at 600–01. The court also pointed out that the Court of Appeals had held that a franchisor's

failure to act upon first learning of the misbranding does not permanently waive his right to terminate because "a repeat occurrence of the misbranding renews the franchisor's right to terminate on that ground." *Amoco*, 607 F.Supp. at 601; *see also Chevron U.S.A. Inc., v. Finn*, 851 F.2d 1227, 1230 (9th Cir.1988) (operator's eleven separate purchases of gasoline that was not produced by the franchisor were each separate violations of the lease agreement with franchisor and constituted separate grounds for terminating the lease under the Petroleum Marketing Practice Act); *Haynes v. Exxon*, 512 F.Supp. 543, 544 (E.D.Tenn.1981) ("it is undisputed that plaintiff mislabeled and misbranded motor fuels").

The Court further notes that 15 U.S.C. § 2802(c)(10) of the PMPA defines "an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable" to include events such as:

> (10) willful adulteration, mislabeling or misbranding of motor fuels or other trademark violations by the franchisee;

Applying the PMPA to the facts of this case, the Court finds that Koylum's conduct was grounds for termination of the franchise. Koylum admits to purchasing unbranded gasoline and selling it to motorists under the Coastal brand name, which was prohibited by the franchise agreement. According to the law set forth in *Wisser*, 730 F.2d at 57, the misbranding provision in a franchise agreement is reasonable and material under the PMPA. Therefore, Koylum's failure to comply with the reasonable and material misbranding provision of the franchise agreement provides grounds for termination of the agreement under 15 U.S.C. §§ 2802(b)(A) and (C). *See Wisser*, 730 F.2d at 57; *Amoco*, 607 F.Supp. at 600–01.

Nevertheless, as mentioned above, Koylum contends that Ocean/Peksen's failure to fax daily prices, and the fact that Ocean/Peksen previously supplied non-Coastal gasoline to Koylum obviates the need for Koylum to comply with its franchise agreement.

## C. As to the Plaintiff's First Defense—That Ocean/Peksen Violated the Terms of the Rider in Failing to Fax Daily Prices

■ The Court finds that the evidence presented during the trial established that Peksen faxed the daily prices to Koylum as required by the terms of the Rider. The Court finds that Mine Peksen was a credible witness who testified that there was an employee designated to fax each day's prices to Koylum. Further, as Mine Peksen explained, it is reasonable to believe that some of the daily faxes were disposed of after the bills were paid. Although Peksen only recovered one fax from the Trustee's Office, Koylum produced 132 faxes in discovery (Dft.Ex.F). Although Koylum sent a reminder letter to Ocean on August 27, 1997, it never complained in any letter or any oral communication that it did not receive the daily fax prices.

Moreover, assuming that Peksen did not send faxes on several days, such a failure does not justify Koylum's purchase and sale of unbranded gasoline and failure to use National Petroleum Transporters to transport the gasoline because Koylum itself violated two material conditions in the Rider that relate to its option to purchase and transport gasoline from suppliers other than Ocean. In reaching this conclusion, the Court first finds that the clauses in the Rider relating to documentation and transportation are clear and unambiguous. The initial interpretation of a contract is a matter of law for the court to decide. *Readco v. Marine Midland*

*Bank,* 81 F.3d 295, 299 (2d Cir.1996). In *Alexander & Alexander Servs., Inc. v. Lloyd's,* 136 F.3d 82, 86 (2d Cir.1998), the Second Circuit stated that "[i]f the Court finds that the contract is not ambiguous it should assign the plain meaning to each term and interpret the contract without the aid of extrinsic evidence." "Contract language is unambiguous when it has a definite and precise meaning and where there is no reasonable basis for a difference of opinion." *Klos v. Lotnicze,* 133 F.3d 164, 168 (2d Cir.1997).

The clear and unambiguous terms of the Rider require Koylum to (1) document its calculations justifying its exercise of the option to purchase from another supplier; and (2) use National Petroleum Transporters to transport all fuel purchased from another supplier. Koylum did not comply with either of these requirements. First, it provided no "documentation of prices supporting its claim of excessive prices." Apparently, Koylum was content to buy gasoline elsewhere and not provide Ocean/Peksen with any documentary proof that the price charged by Koylum exceeded the price set forth in the Rider. In this regard, Koylum failed to demonstrate that Ocean's prices exceeded the market price for petroleum products sold by other legitimate and legally licensed suppliers in the open market. Stated simply, the plaintiff produced no evidence that Ocean's prices did not meet the formula when compared to other suppliers on the open market. Second, Koylum's excuse for failing to use National Petroleum Transporters was that one of its gasoline suppliers declined to do so. Accordingly, the Court finds that Koylum breached these two provisions of the Rider to the Supply Agreement.

In sum, the Court finds that most of the faxes were sent as required by the terms of the Rider. As to any days when the faxes were not sent, there was a total lack of compliance by Koylum with the material provision requiring it to document the prices supporting its claim of excessive prices. The daily fax situation did not excuse the material breach by Koylum in purchasing non-Coastal branded gasoline and selling it to motorists under the Coastal flag.

**D. As to the Plaintiff's Second Defense—That Ocean Itself Delivered Non Coastal Gasoline to Koylum**

■ At the trial, Koylum offered, as an excuse for selling misbranded gasoline, that Ocean itself supplied it with non-Coastal gasoline. The Court is not persuaded by this contention. Peksen testified that all gasoline in Long Island is distributed from storage terminals that all commingle the gasoline. In addition, Peksen testified that all non-Coastal gasoline that was delivered to the Ridge Station was with the approval and authorization of Coastal. If there was such approval by Coastal, such consent terminated on October 29, 1998. In a letter from Montgomery L. Smith, attorney for Coastal, dated October 29, 1998 (Dft.Ex.K) it was stated that "Ocean is in breach of the foregoing provisions of the Franchise Agreement in that Ocean is selling products of others under Coastal's marks." This letter is evidence that, at least after October 29, 1998, Ocean could not supply Koylum with non-Coastal product. Certainly, if Coastal authorized Ocean to deliver non-Coastal gasoline, it would not violate the terms of the Supply Agreement. *See Amoco Oil Co. v. D.Z. Enterprises, Inc.,* 607 F.Supp. 595 (E.D.N.Y.1985) ("It is settled that the trademark holder need not actually manufacture the branded product in order to receive trademark protection, but can merely select and designate the product bearing the mark."); *Menedez v. Holt,* 228 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526 (1888).

A close look at the letter from Coastal's attorney, dated October 29, 1998, reveals the following: First, "Ocean defaulted on several payments and substantially exceeded its credit line," constituting a breach of the franchise agreement between Ocean and Coastal. Second, Ocean is in breach of the franchise agreement "in that Ocean is selling products of others under Coastal's marks" and Ocean is directed to "immediately cease the use of Coastal's mark in association with the sale of motor fuels provided by parties other than Coastal." This letter does not necessarily conflict with the testimony of Mine Peksen that on June 11, 1998, June 19, 1998, June 26, 1998, July 3, 1998, September 7, 1998 and September 27, 1998, she delivered non-Coastal gasoline to the Ridge Station with the consent of Coastal. No one at Coastal was called by the plaintiff to refute this testimony.

Moreover, Koylum has furnished the Court with no authority that, because Ocean, the distributor, furnishes non-branded gasoline with the consent of the refiner Coastal, the franchisee/Koylum can, on its own, also do so. In fact, the only case cited by Koylum in its Post Trial Memorandum of Law (p. 14), *Power Test Petroleum Distributors v. Calcu Gas, Inc.,* 754 F.2d 91 (2d Cir.1985), cites to *Wisser* in which the Second Circuit stated that "the misbranding of gasoline by a franchisee ('passing off non-Mobil gasoline under the Mobil trademark') was 'a serious violation of [the franchisor's] contract and property rights, and it was perpetrating a fraud on the public.'" Clearly, *Wisser* and *Calcu Gas* deal with the consequences of a franchisee who misbrands gasoline, not the consequences of a franchisor who misbrands gasoline.

Further, the footnote the plaintiff cites in its memorandum seems to confirm that even if Ocean delivered non-Coastal gasoline to the Ridge Station, this did not give license to Koylum to do the same thing, namely, without authority from Ocean or Coastal, to purchase non-Coastal gasoline and sell it to motorists under the Coastal brand. The footnote reads:

> Because Power Test alone has the right to place its trademark on the gasoline it deems appropriate does not mean that Yonkers, which does not control that mark, can independently decide that other gasoline is just the same as Power Test's. The essence of the trademark is that the owner controls its own product. *See Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 478 F.Supp. 243 (E.D.Pa. 1979), *aff'd,* 637 F.2d 105 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981).

*Calcu Gas,* 754 F.2d at 98 n. 9.

In *Amoco Oil Co. v. D.Z. Enterprises, Inc.,* 607 F.Supp. 595, 598, 599 (E.D.N.Y. 1985), it was held that:

> It is settled that the trademark holder need not actually manufacture the branded product in order to receive trademark protection, but can merely select and designate the product bearing its mark. *Menendez v. Holt,* 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526 (1888). This principle has been applied explicitly to cases of gasoline branding like the one at hand. In *Edward J. Sweeney & Sons, Inc. v. Texaco Inc.,* 478 F.Supp. 243 (E.D.Pa.1979), *aff'd,* 637 F.2d 105 (3d Cir.1980) *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981) the plaintiff contended that since Texaco purchased gasoline from other refiners and sold it to plaintiff as Texaco gasoline, Texaco could not claim plaintiff violated its trademark by doing the same thing. This is exactly Karabag's argument. The law, however, holds the contrary to be true. As the *Sweeney* Court held, *what constitutes a particular brand of gasoline is for the trademark*

*holder in its discretion to determine. Id.* at 279. Moreover, commingling, the refinery of the gasoline, and the presence or absence of patented additives are not determinative of the trademark. *Id.* As the *Sweeney* Court held, "Clearly, Texaco had the right to put its trademark on whatever gasoline it deemed suitable. *The crucial point ... is that just because Texaco, the owner of the trademark, could decide what gasoline to market under that trademark does not mean that Sweeney, who had only the right to sell gasoline so marked, had a like right to decide what gasoline to call Texaco.*" (Emphasis added).

In sum, Ocean's action in delivering non-Coastal gasoline with the consent of Coastal, can afford no solace to Koylum, for its conceded substantial "serious violation of the franchisor's contract ... perpetrating a fraud on the public."

The plaintiff's reliance on *Retsieg Corp. v. ARCO Petroleum Products Co.*, 870 F.2d 1495 (9th Cir.1989), is misplaced. Unlike the facts in this case, in which Koylum concedes that it purchased non-Coastal gasoline and sold it to motorists under the Coastal brand, in *Retsieg*, the service station operator "claims that it did not intend to misbrand at all." *Id.* at 1498. In this case, Koylum intentionally purchased non-Coastal gasoline from a source other than Ocean and sold it to motorists under the Coastal brand.

Koylum's own records revealed that during the months of August 1997, September 1998, October 1998, November 1998 and January 1999 it made purchases of unbranded gasoline, which it caused to be delivered to the Ridge station, which was then identified by the Coastal mark on the identification sign on the corner of the Station; by the Coastal brand on the building; and by the Coastal brand on each of the dispensing pumps. Without any authority or permission by Ocean or Coastal, and, in fact without their knowledge, Koylum then sold that non-Coastal gasoline to motorists as a Coastal brand gasoline. This was no occasional sale of non-Coastal gasoline under the Coastal brand. By October 2, 1998, the date the termination notices were served, Koylum had already received deliveries of 93,800 gallons of unbranded gasoline from Benit Fuel Sales & Service, Inc., which was sold to the motoring public under the Coastal mark. A total of 141,260 gallons of unbranded gasoline was purchased and sold by Koylum as Coastal brand gasoline. (See Dft. Exs. P, R, T and V). This activity included intentional purchases of non-Coastal gasoline sold to motorists under the Coastal brand, within sixty days of October 2, 1998.

As stated above, the Court finds that there was intentional misbranding within 60 days of the Notice of Termination. Subsequently, the defendants obtained evidence of more serious misbranding activities by Koylum, not within the 60–day period. In this regard, "A repeat occurrence of the misbranding renews the franchisor's right to terminate on that ground." *Amoco Oil Company v. D.Z. Enterprises, Inc.*, 607 F.Supp. 595, 600–601 (E.D.N.Y.1985) citing *Wisser v. Mobil Oil Corp.*, 730 F.2d at 60.

Thus, the Court finds that Peksen's sale of non-Coastal gasoline to Koylum does not justify Koylum selling unbranded gasoline under the Coastal flag. Accordingly, the Court finds that Peksen's alleged failure to fax daily prices and its delivery to Koylum of non-Coastal gasoline did not justify Koylum's material breach of the franchise agreement, namely purchasing and selling unbranded gasoline under the Coastal flag.

**E. As to the Right of First Refusal**

Koylum also contends that when Peksen/Ocean sold the Ridge Station to 1677

Ridge, Koylum should have been given the right of first refusal as required by the PMPA. While the PMPA itself contains no statement of legislative purpose, it is clear that it was enacted because of concern that franchisors "used the threat of franchise termination to impose harsh conditions upon the business operations of franchisees." *Keener v. Exxon Company, USA,* 32 F.3d 127 (4th Cir.1994), *cert. denied* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1994). However, the Act did not create absolute protection for franchisees. It established only minimum federal standards governing the termination of franchise relationship. *Tobias v. Shell Oil Co.* 782 F.2d 1172, 1174 (4th Cir.1986).

In this regard, the statute allows for the nonrenewal of the franchise relationship if the franchisor determines, in good faith and in the normal course of business, among other things, to sell the premises, 15 U.S.C. § 2802(b)(3)(D)(i)(III), and either "made a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interest in such premises," 15 U.S.C. § 2802(b)(3)(D)(iii)(I), or "if applicable, offered the franchisee a right of first refusal ... to purchase such franchisor's interest in such premises." 15 U.S.C. § 2802(b)(3)(D)(iii)(II).

This "right of first refusal" should be extended by the franchisor—Peksen/1677 Ridge—to the franchisee—Koylum—only if the sale of the gas station causes nonrenewal of the franchise relationship. *See Cinco J. Inc. v. Boeder,* 920 F.2d 296, 299–300 (5th Cir.1991) (Section 2802(b)(3)(D) "provides that a franchisor who determines in good faith to sell, alter, or convert the station may refuse to renew the franchise relationship, but it must first offer the dealer an opportunity to purchase the property."); *see Beachler v. Amoco Oil Co.,* 112 F.3d 902, 909 (7th Cir.1997) (The right of first refusal only applies "in the event that a franchisor will not be renew-

ing a franchise relationship.... As the statute makes clear, the opportunity to purchase need only be afforded a dealer if the franchise relationship is not being renewed."); *see also Clark v. BP Oil Co.,* 930 F.Supp. 1196, 1207 (E.D.Tenn.1996) *aff'd* 137 F.3d 386 (1998) ("The statute applies only if the sale of the marketing premises causes non-renewal of the franchise relationship"); *Patel v. Sun Refining and Marketing Company,* 710 F.Supp. 1023, 1024 (E.D.Pa.1989) ("[T]he franchisor is at liberty to sell the premises at any time, to anyone; all the statute says is that such a sale cannot justify non-renewal of the franchise unless the franchisor did allow the franchisee to purchase."); *Atlantic Richfield Company v. Brown,* 1985 WL 3316 (N.D.Ill.) (The right of first refusal applies only to nonrenewals and does not control cases in which franchisees are terminated).

■ In this case the "right of first refusal" was not triggered by the sale of the gas station premises by Peksen to 1677 Ridge on May 6, 1999 for two reasons. First, the sale of the Ridge Station did not cause the nonrenewal of the franchise relationship because the franchise terminated in October 1998 by reason of Koylum's purchase of unbranded gasoline and sale of the same to motorists under the Coastal brand.

■ Second, grounds for nonrenewal of the franchise arose after 1677 Ridge, the new owner, offered Koylum an opportunity to continue the Coastal franchise under the new owner's auspices, which offer was rejected by Koylum. *See* 15 U.S.C. § 2802(b)(2)(E)(iii)(II). Section 2802(b)(E) allows for the termination or nonrenewal of a franchise when the franchisor decides "in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the marketing premises are located;" the

franchisor sells his interest in the premises; and the purchaser of the franchisor's interest "offers, in good faith, a franchise to the franchisee on terms and conditions which are not discriminatory to the franchisee as compared to franchises then currently being offered by" the purchaser. 15 U.S.C. § 2802(b)(E)(iii)(II).

Here, the evidence presented at trial shows that Peksen decided to withdraw from the marketing motor fuel business. The Court finds that this determination was made in good faith and in the normal course of business. Following Peksen's sale of its interest in the Ridge Station to 1677 Ridge, the new owner offered Koylum a franchise, the terms of which were not discriminatory. Frank Mascolo is the President of 1677 Ridge, and is a Coastal distributor. In a conversation with Erol Bayraktar in June 1999 in front of the landlord/tenant court, Mascolo offered Bayraktar an opportunity to stay at the Ridge station with a new contract if he would brand the station as a Coastal station. Bayraktar insisted on a "formula" as to price. Mascolo declined to enter into this "formula" pricing, and stated that he would sell Koylum Coastal gasoline "like I would sell anybody else." Bayraktar refused to enter into this new franchise agreement. Bayraktar confirmed that he refused to accept a new franchise agreement from Mascolo, unless the purchases of gasoline would be set by the "formula." Presumably, the "formula" would be identical to the one set forth in the Rider to the Supply Agreement between Koylum and Ocean.

A somewhat similar situation occurred in *Russo v. Texaco, Inc.,* 630 F.Supp. 682 (E.D.N.Y.1986), *aff'd* 808 F.2d 221 (2d Cir. 1986), where Texaco sought to acquire the assets of Getty Oil Company, including its gasoline stations. The court held that the franchisee cannot insist on a relationship with the new owner on the terms of the former relationship with the prior owner.

There is nothing in the language of the Act suggesting that a major national acquisition and large scale divestiture for bona fide business reasons *was intended to be stymied by the right of individual franchisees to insist on a prior relationship on exactly its former terms.*

\* · \* \* \* \* \*

The legislation recognized the "legitimate needs of a franchisor to be able to terminate a franchise based upon ... changes in circumstances." S.Rep. No. 95–731, 95th Cong., 2d Sess. 18–19, *reprinted in* 1978 U.S.Code Cong. & Ad. News 873, 877. Congress expressly recognized "the importance of providing adequate flexibility so that franchisors may initiate changes in their marketing activities to respond to changing marketing conditions and consumer preferences." *Id.* at 19, 1978 U.S.Code Cong & Ad. News at 877.

What is reasonable depends upon good faith business judgments of the parties.

\* \* \* \* \* \*

Courts are not in a position to second guess management on the reasonableness of their business judgments in cases such as this.

*Id.* at 370 (emphasis added); *see also May–Som Gulf, Inc. v. Chevron U.S.A., Inc.,* 869 F.2d 917, 921 (6th Cir.1989) (approving the language in Russo).

Clearly the PMPA does not require 1677 Ridge to offer Koylum a franchise on the same terms as did Ocean/Peksen. Moreover, the terms of the franchise offered by 1677 Ridge were not discriminatory and were entirely reasonable. 1677 Ridge's offer to sell Koylum gasoline at the same price offered to its other customers was a good faith business judgment which this

Court is not inclined to second guess. *See Russo*, 630 F.Supp. at 688–89. Thus the sale of the Ridge Station to 1677 Ridge and the new owner's offer of a franchise to Koylum is, in and of itself, grounds for nonrenewal of the franchise under 15 U.S.C. § 2802(b)(2)(E)(iii). Accordingly, the sale of the premises to 1677 Ridge did not trigger the right of first refusal under 15 U.S.C. § 2802(b)(3)(D)(iii)(II).

The Court also notes that Koylum is not entitled to take advantage of the PMPA's right of first refusal provision because it is seeking to perpetuate a lease and not a franchise involving the use of any franchised mark. *See Koylum v. Peksen*, 272 F.3d 138, 146 (2d Cir.2001) ("The district court might ultimately conclude, if Koylum is seeking to perpetuate a lease and not a franchise involving use of any franchised mark, that it is not entitled to take advantage of the Act's provision for a right of first refusal to acquire the premises."). The unrefuted evidence that Koylum failed to take any action to continue the use of the Coastal brand; apparently has no interest in using that gasoline or that brand name; and has declined Mascolo's offer to start anew as a Coastal station, is an unequivocal statement of a total lack of interest in continuing to be a Coastal franchisee. In this action, Koylum solely seeks to perpetuate a lease and/or seeks the opportunity to purchase the 1677 Ridge property, without complying with the most material provisions of the PMPA. Accordingly, it is not entitled to the right of first refusal as set forth in the PMPA.

## IV. *CONCLUSION*

The Court finds that the plaintiff Koylum breached both the Supply Agreement and the Lease, in a material matter. Koylum violated the two most important obligations on its part with regard to both agreements—(1) to purchase only Coastal brand gasoline, and (2) to sell only Coastal brand gasoline to its motorist custom-

ers while flying the Coastal brand flag. The reasons given by Koylum for its violations of both agreements, the Rider fax provisions and the fact that Ocean itself delivered non-Coastal gasoline, cannot ameliorate this material breach by Koylum, involving the very crux of the agreements.

Accordingly, the Court finds that Peksen's termination of the lease and Ocean's termination of the franchise Supply Agreement between it and Koylum was lawful. The Court vacates the preliminary injunction dated August 28, 1999 in favor of Koylum and against Peksen and 1677 Ridge. In addition, the request by Koylum that Peksen offer Koylum a "right of first refusal to purchase the leased marketing premises," is denied.

The complaint is dismissed with costs.

The defendants also make a claim for attorney's fees and expert witness fees. However, the Court recalls no experts who were called as witnesses. With regard to attorney's fees, the Court notes the applicable provisions of 15 U.S.C. § 2805(d)(3), as follows:

> (3) In any action under subsection (a) of this section, the court may, in its discretion, direct that reasonable attorney and expert witness fees be paid by the franchisee if the court finds that such action is frivolous.

By no means can the Court find that Koylum's action is "frivolous." Accordingly, the defendants' request for "reasonable attorney and expert witness fees," is denied.

The attorneys are directed to appear in Court on October 9, 2002 at 9:00 a.m., to discuss the questions of (1) the resolution of the District Court cases, (2) the lifting of the stay in the District Court, (3)the termination of occupancy by Koylum, and

(4) the terms of a stay pending appeal, if so desired by the plaintiff.

SO ORDERED.